LEONARD REFINERIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11159. Promulgated December 7, 1948.

*N. Barr Miller, Esq.*, for the petitioner.
*Howard M. Kohn, Esq.*, for the respondent.

## OPINION.

HILL, *Judge*: The ultimate issue in this proceeding is the excess profits tax liability of petitioner for its fiscal years 1943 and 1944. In determining this liability we must decide the excess profits credit and the unused excess profits credit adjustment to which petitioner is entitled. Under the terms of section 712 of the Internal Revenue Code petitioner elected to use the average base period net income method to determine its excess profits credit. Both parties agree that the provisions of section 713 (f) (6)[1] govern petitioner's average base period

---

[1] SEC. 713. EXCESS PROFITS CREDIT—BASED ON INCOME.

　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*

(f) AVERAGE BASE PERIOD NET INCOME—INCREASED EARNINGS IN LAST HALF OF BASE PERIOD.—The average base period net income determined under this subsection shall be determined as follows:

　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*

(6) The amount ascertained under paragraph (5) shall be the average base period net income determined under this subsection, except that the average base period net income

net income, and as a consequence that the amount of such income is equal to petitioner's excess profits income for the fiscal year 1940. Respondent contends that the net income reported by petitioner on its tax return for 1940 constitutes the correct net income for the purpose of computing excess profits credit. Petitioner contends that the net income reported for the year 1940 was erroneous, due to an excessive depreciation deduction, and that it is entitled to use the correct net income for that year in computing its excess profits credit. We shall first consider whether petitioner is permitted to redetermine the correct net income for a base period year for the purpose of ascertaining its excess profits credit, and, secondly, whether the depreciation deduction taken in 1940 was excessive in amount, as alleged by petitioner.

We find ample authority for the proposition that, for the purpose of computing petitioner's excess profits credit under section 713, the net income reported by petitioner in a base period year may be re-examined for its correctness under rules of law existing at that time. No excess profits tax provision in the code specifically requires that the excess profits credit under section 713 be computed by the use of net income figures used by the taxpayer in its income tax returns for base period years. Section 734 of the code expressly contemplates that an item affecting the determination of the excess profits credit may be treated in a manner inconsistent with the treatment accorded such item in the determination of the income tax liability of a taxpayer in a prior taxable year. Regulations 112, section 35.734 (2)–c, also makes it clear that in determining its excess profits credit petitioner is not bound by the net income it reported in 1940. It states in part:

> * * * Either the Commissioner or the taxpayer, however, may insist upon the correct treatment of such item or transaction [incorrectly treated in determining taxpayer's income tax liability for a prior taxable year] in the determination of the excess profits credit * * *.

The principle that an item of depreciation which is treated erroneously in determining the income tax of a base period year may be corrected in the computation of excess profits credit has been recognized by this Court before. See *Zellerbach Paper Co.*, 8 T. C. 511; *Carithers-Wallace Courtenay*, 5 T. C. 942; and *Rosemary Manufacturing Co.*, 9 T. C. 851. In the last named case the Court stated (p. 861) :

> We recognize that the apparent Congressional intent to be gleaned from an examination of the excess profits tax provisions of the code is that the correct net income of taxpayers for the base period be used in calculating their excess profits credits * * *.

---

determined under this subsection shall in no case be greater than the highest excess profits net income for any taxable year in the base period. For the purpose of such limitation if any taxable year is of less than twelve months, the excess profits net income for such taxable year shall be placed on an annual basis by multiplying by twelve and dividing by the number of months included in such taxable year.

Next, we must determine whether depreciation deductions taken on certain assets by petitioner in the fiscal year 1940 were excessive, thereby causing the net income reported for the year to be incorrect. What was the proper basis for a depreciation deduction under the code in 1940? Section 23 (1) permitted a "reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business * * *." Regulations 111, section 29.23 (1)-5, states in part that the "reasonableness of any claim for depreciation shall be determined upon the conditions known to exist at the end of the period for which the return is made." The courts have upheld the validity of this interpretation of the statute and have similarly considered a "reasonable allowance" under section 23 (1) to mean one based on the expected useful life of the depreciable asset in the light of facts known or reasonably ascertainable at the end of the current taxable year. *Lake Charles Naval Stores*, 25 B. T. A. 173; *Commissioner* v. *Mutual Fertilizer Co.*, 159 Fed. (2d) 470; and *Commissioner* v. *Cleveland Adolph Mayer Realty Corporation*, 160 Fed. (2d) 1012. This is the test we must apply to the items of depreciation challenged by petitioner.

Petitioner contends that two errors were made in the determination of its depreciation deduction for the fiscal year 1940 on the basis of facts known or reasonably ascertainable at the end of that year. The first alleged error is that an excessive rate of depreciation was applied to six classes of assets at the Alma and St. Louis plants. The first four classes, "towers and chambers," "pumps and controls," "pipes and fittings," and "boilers and equipment," plus a portion of the fifth class, "other items," consisted of production equipment. The remaining assets in the fifth class, "other items," and the sixth class, "furniture and fixtures," were made up of nonproduction items.

Petitioner seeks to justify its first allegation of error in the following manner: The depreciation deductions taken on these six classes of assets in the fiscal year 1940 were based upon a depreciation schedule compiled in 1936 and 1937. In the interval between 1937 and 1939 two events occurred which were not considered in making up the original schedule, both of which had the effect of prolonging the useful lives of these assets. In 1937 and 1938 a desalting unit was installed and effectively adjusted to remove from 60 to 90 per cent of the corrosive salt compounds in the Michigan crude oil. Secondly, petitioner maintained a policy of inspecting and immediately repairing the effects of corrosion on its production equipment. Finally, to prove these items of depreciation were excessive, petitioner points out that the conditions and circumstances affecting the useful lives of petitioner's depreciable assets were the same throughout the fiscal years 1940, 1941, and 1942; that upon investigating the depreciation deductions taken by petitioner in 1941 and 1942 which were based on depre-

ciation rates previously used in 1940, a Bureau engineer recommended a lower depreciation rate on these six classes of assets.

We are unable to conclude that petitioner has sustained its burden of proof that the depreciation deductions taken on these six classes of assets for the fiscal year 1940 were excessive based on circumstances and conditions known or reasonably ascertainable at the end of that year. We have accorded due weight to the estimate of the useful lives of these assets made by petitioner at the close of the fiscal year 1940 as indicated by the depreciation deductions claimed on its tax return for that year. This constitutes an admission against interest by petitioner, especially in the light of its president's testimony that the depreciation rates for that year seemed reasonable in the light of information and experience available at the time. *United States* v. *Farrell*, 35 Fed. (2d) 38.

We do not think the fact that a desalting unit was effectively operating at the Alma plant in 1938 makes the 1940 depreciation rates on the six classes of assets unreasonable simply because this factor was not considered in originally fixing these rates. There is no evidence that such a machine prolonged the useful lives of either nonproduction assets or production equipment which did not come into actual contact with the crude oil. Further, the desalter had no effect on the sulphur compounds in the Michigan oil, which were the most important corrosive element. We have no basis in the facts for calculating how much it reduced the total corrosion inherent in the refining process. We can not determine from the evidence that the facts known or reasonably ascertainable at the end of the fiscal year 1940 did not warrant the rate of depreciation used by petitioner in its return for that year in respect of the six classes of assets in question in computing its taxable net income.

Nor do we find greater merit in petitioner's contention regarding the effect of its maintenance and repair program on the useful lives of the six classes of assets. There is no conclusive showing that this factor was not taken into consideration when the original depreciation schedule was set up by petitioner at the Alma plant. Certainly it was known at that time that the Universal Oil Products Co. would inspect the refining equipment and make recommendations for maintenance and repair. There is no evidence whether McClanahan considered the effect of a maintenance program in fixing depreciation rates on its St. Louis assets which petitioner later adopted, and we may not assume that it did not do so. Furthermore, the only inspection and repair program discussed by petitioner was limited to production equipment and did not cover any nonproduction equipment in the six classes of assets challenged by petitioner. Finally, there is insufficient evidence to conclude how decisively this factor extended the lives of petitioner's production assets. There is no basis for saying

that it was so effective as to make the original depreciation schedule erroneous.

Petitioner's allegation of error is not strengthened by the combined circumstances that conditions affecting the useful lives of the six classes of assets did not change during the fiscal years 1940, 1941, and 1942 and that the Bureau engineer found depreciation deductions taken on these assets in 1941 and 1942 were excessive. The record fails to clearly reveal why the engineer considered these items had a longer life than originally estimated by petitioner. Since we do not know upon what facts he based his recommendations, we are unable to judge whether they were known or reasonably ascertainable at the close of the fiscal year 1940, even if we assume they were in existence at that time. The fact that neither petitioner nor the Commissioner felt it necessary to examine the propriety of the original depreciation rates in the light of conditions known to exist during fiscal years 1937–1940 points to an opposite conclusion. We thus conclude that petitioner has failed to overcome its burden of proving that the 1940 depreciation deductions on the six classes of assets were unreasonable and excessive.

The second error in computing the depreciation deduction for the fiscal year 1940 alleged by petitioner relates to seven assets located at the St. Louis plant. Petitioner changed their depreciation rate from a schedule based on the term of the lease on the land where they lay to their estimated physical lives on October 1, 1939, after it had exercised the option to buy the land. It now contends that the depreciation rates for the entire year should have been based on the physical lives of these assets, which in each instance exceeded the ten-year period of the lease.

We not only agree with petitioner's contention that the depreciation it took on the seven St. Louis assets for the fiscal year 1940 was excessive, but we think the depreciation claimed on these items for the fiscal year 1939 was equally incorrect under the law applicable at that time. Petitioner acquired the St. Louis plant on January 13, 1939; for the fiscal year 1939 and the first half of the fiscal year 1940 it adopted the McClanahan depreciation schedule on these assets, which was based on the term of the original lease. In the light of facts known to exist at the close of both fiscal years, we must conclude that depreciation taken in those years fails to meet the test of reasonableness laid down by the courts. We hold that the depreciation rates for 1939 and 1940 should have been based on the physical lives of these assets because of circumstances known to petitioner on March 31, 1939, the close of the fiscal year 1939.

What facts were known by petitioner on that date? Petitioner knew that it intended to continue operation of the St. Louis refinery beyond the termination of the original lease. A letter it sent to stock-

holders on December 3, 1938, concerning the McClanahan properties stated that this plant could be operated advantageously in connection with the Alma refinery. As further proof of this intent, the St. Louis plant remained in regular operation for the balance of the fiscal year 1939. Furthermore, petitioner knew that it intended to exercise the option to acquire the St. Louis plant site. Petitioner's president testified that purchase of the land was anticipated and planned at the time the assets of McClanahan were acquired in January 1939. Other facts known by petitioner on March 31, 1939, corroborate this admission. The McClanahan balance sheet as of October 31, 1938, valued its property, plant, and equipment at approximately $294,934.68. Few of the improvements comprising this plant were capable of removal from the premises. This refinery produced a net income of $10,686.07 for the first ten months of 1938. The cost of purchasing the plant site was only $7,000. It is only reasonable to think that petitioner did not acquire a prosperous going business of this size without also intending to spend an additional $7,000 to insure its continued operation beyond the term of a lease which had only six years to run. We conclude that it was a known fact on March 31, 1939, that petitioner would purchase the land.

Where it appears certain that an option to purchase leased premises will be exercised, over what period should assets on those premises be depreciated? Decisions pertinent to this question deal with a comparable situation where there is a reasonable certainty that a renewal provision in a lease will be exercised. Under those circumstances the courts have held the proper period for taking depreciation is the remaining life of the original term plus the renewal period. *Pittsburgh Union Stock Yards Co.* v. *Commissioner*, 46 Fed. (2d) 646; *1620 Broadway Corporation*, 36 B. T. A. 149, 152; *Standard Tube Co.*, 6 T. C. 952. By analogy, where it is apparently certain that the option to purchase leased land will be exercised, depreciation rates for assets located on such land should be based on their estimated physical lives. As was said in *Rankin* v. *Commissioner*, 60 Fed. (2d) 76, it is only necessary that it appear the lessee's use or occupancy will exceed the life of the improvement. If that requirement is met, then the depreciation should be spread over the full life of the asset.

In view of the above authorities, we conclude that the depreciation rates on the seven St. Louis assets for the fiscal year 1939 should have been based on their estimated physical lives rather than the ten-year lease term and that the depreciation deduction actually taken was excessive.

The same reasoning applies to the depreciation rates employed by petitioner at the close of the fiscal year 1940, for at that time the

option to purchase had been exercised and it was known absolutely that depreciation could be spread over the physical lives of these assets. Furthermore, depreciation is an annual affair, to be calculated at the end of the year in view of all preceding events. Therefore, we hold that the amount of depreciation taken on these assets for the fiscal year 1940 which was based in part on the ten-year term of the lease was also incorrect and excessive.

We must consider next the proper amount of depreciation for the seven assets in the fiscal year 1940 for the purpose of computing the correct net income of petitioner for that year. Petitioner acquiesced in the recommendation of the Bureau engineer concerning depreciation rates for the fiscal years 1941 and 1942. We have no reason to doubt the correctness of such rates for the seven St. Louis assets for those two years. The evidence is undisputed that conditions affecting the lives of petitioner's depreciable assets remained constant over the fiscal years 1940, 1941, and 1942. Where circumstances influencing the lives of depreciable assets in successive years are the same, the rates of depreciation applicable for those years should also be the same. Therefore, we hold that, for the purpose of determining petitioner's excess profits credit, its net income for the fiscal year 1940 must be recomputed, using the depreciation rates on the seven St. Louis assets recommended by the Bureau engineer for the fiscal years 1941 and 1942 rather than the rates used by petitioner in calculating its income tax liability for 1940. When corrected in the above manner, petitioner's net income for 1940 will provide a proper basis for determining petitioner's excess profits credit and in turn its excess profits tax liability.

Since we have determined that petitioner's excess profits tax credit is to be computed by using lower depreciation rates on certain assets than previously were used by petitioner in computing its income tax liability for the years 1939 and 1940, then, as both parties agree, section 734 of the code entitles respondent to a corresponding correction in petitioner's prior income tax liability by an adjustment in petitioner's excess profits tax. In general, this section provides that, if in determining the excess profits tax liability of a taxpayer an item is treated inconsistently with its treatment in the determination of the income tax liability for a taxpayer for a prior taxable year and if the item were treated in the determination of the income tax liability in a manner consistent with its treatment in ascertaining the excess profits tax liability of the taxpayer there would have been an increase or a decrease in the income tax previously determined for those years, then under certain conditions such a correction shall be made by an adjustment of excess profits tax either by way of increase or decrease.

The facts of this case meet all the prerequisites for invoking section 734.[2] Our determination of petitioner's excess profits tax liability treats an item in a manner inconsistent with the treatment accorded such item in the determination of taxpayer's prior income tax liability. In computing petitioner's excess profits credit we have held petitioner is entitled to a smaller depreciation deduction than it took in computing its income tax liability for the fiscal years 1939 and 1940. Congress and the Treasury Department have both recognized that "inconsistent treatment" within the meaning of section 734 may relate to the amount of an item such as a depreciation deduction. See H. Rept. No. 146, 77th Cong., 1st sess., (C. B. 1941-1, pp. 550, 563) and Regulations 112, sec. 35.734-2 (c).

The treatment of the item in a prior taxable year consistently with our determination for the purpose of computing petitioner's excess profits credit would effect a change in the amount of the income tax previously determined for such taxable year. To reduce the depreciation deduction for the years 1939 and 1940 would increase petitioner's net income and therefore its income tax for these years.

Likewise, the treatment of the item for the purpose of determining the income tax liability of petitioner for a prior taxable year was incorrect under the law applicable to that year. The amount of de-

---

[2] SEC. 734. ADJUSTMENT IN CASE OF POSITION INCONSISTENT WITH PRIOR INCOME TAX LIABILITY.

\* \* \* \* \* \* \*

(b) CIRCUMSTANCES OF ADJUSTMENT.—

(1) If—

(A) in determining at any time the tax of a taxpayer under this subchapter an item affecting the determination of the excess profits credit is treated in a manner inconsistent with the treatment accorded such item in the determination of the income-tax liability of such taxpayer or a predecessor for a prior taxable year or years, and

(B) the treatment of such item in the prior taxable year or years consistently with the determination under this subchapter would effect an increase or decrease in the amount of the income taxes previously determined for such taxable year or years, and

(C) on the date of such determination of the tax under this subchapter correction of the effect of the inconsistent treatment in any one or more of the prior taxable years is prevented (except for the provisions of section 3801) by the operation of any law or rule of law (other than section 3761, relating to compromises),

then the correction shall be made by an adjustment under this section. If in a subsequent determination of the tax under this subchapter for such taxable year such inconsistent treatment is not adopted, then the correction shall not be made in connection with such subsequent determination.

(2) Such adjustment shall be made only if there is adopted in the determination a position maintained by the Commissioner (in case the net effect of the adjustment would be a decrease in the income taxes previously determined for such year or years) or by the taxpayer with respect to whom the determination is made (in case the net effect of the adjustment would be an increase in the income taxes previously determined for such year or years) which position is inconsistent with the treatment accorded such item in the prior taxable year or years which was not correct under the law applicable to such year.

(3) BURDEN OF PROOF.—In any proceeding before the Board or any court the burden of proof in establishing that an inconsistent position has been taken (A) shall be upon the Commissioner, in case the net effect of the adjustment would be an increase in the income taxes previously determined for the prior taxable year or years, or (B) shall be upon the taxpayer, in case the net effect of the adjustment would be a decrease in the income taxes previously determined for the prior taxable year or years.

preciation taken by petitioner in determining its income tax liability for the years 1939 and 1940 was excessive and incorrect according to the test laid down by the courts in interpreting section 23 (1) of the code.

A correction of the effect of the erroneous treatment of petitioner's depreciation deduction for the fiscal years 1939 and 1940 is prevented by operation of law. The period of limitations on the assessment and collection of income tax for the years 1939 and 1940 prescribed by section 275 of the code has run.

Finally, the inconsistent position adopted in our determination of petitioner's excess profits tax is asserted by the party who would be adversely affected by the adjustment under section 734. Petitioner seeks to lower its depreciation deduction for the fiscal year 1940, which would result in increasing its prior income tax liability.

Petitioner contends that under section 734 only its income tax liability for the fiscal year 1940 is subject to correction, whereas respondent argues that it is entitled to correct petitioner's income tax liability for all base period years 1936 through 1940. We believe that respondent has a right to correct petitioner's income tax liability for the years 1939 and 1940. In determining petitioner's excess profits tax we treated its depreciation deduction on the seven St. Louis assets in a manner inconsistent with its treatment by petitioner in calculating income tax liability for each of these years. We found the amount of depreciation taken by petitioner for both 1939 and 1940 to be incorrect under the law applicable at that time. This Court has stated that an adjustment is available only for a year pertinent to the fixing of the excess profits tax liability. See *Zellerbach Paper Co., supra.* We find that the year 1939 is equally pertinent to the fixing of the excess profits tax liability of petitioner as the year 1940. It is true that in computing petitioner's excess profits credit under section 713 (f) (6) its excess profits net income for the fiscal year 1940 constitutes a top limit to its average base period net income; yet that average base period net income has to be determined from net incomes of the years 1936 through 1940, inclusive, before such a limitation is invoked. While the net income for the fiscal year 1940 thus equals the amount of the average base period net income, yet such average base period net income is derived not merely from the year 1940, but from petitioner's net income for all base period years, including 1939. Therefore, we hold that petitioner's excess profits tax liability must be adjusted to include a correction of its income tax liability for the years 1939 and 1940.

The adjustment of petitioner's excess profits tax liability to correct its income tax liability for the fiscal years 1939 and 1940 must be computed under the provisions of section 734 (d). The resulting increase in petitioner's income tax for 1939 and 1940, plus interest, must

be added to petitioner's excess profits tax liabi'ity for the fiscal year ended March 31, 1943, the first taxable year with respect to which the inconsistent position is taken. The date for payment of that tax is June 15, 1943, which is during petitioner's fiscal year 1944. Therefore, by virtue of section 734 (e), the amount of the 1939 and 1940 income tax corrections representing interest is deductible from petitioner's net income for the fiscal year 1944 and must be taken into consideration in computing the excess profits tax for that year. We direct that petitioner's excess profits tax liability for 1943 and 1944 be determined in accordance with the above holdings.

*Decision will be entered under Rule 50.*