VEGETABLE FARMS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17208. Promulgated May 16, 1950.

*Leo T. McMahon, Esq., T. Preston Webster, Esq.,* and *George A. Cavalletto, Esq.,* for the petitioner.

*A. J. Hurley, Esq.,* for the respondent.

OPINION.

ARNOLD, *Judge*: Petitioner contests respondent's disallowance of deductions taken for salaries paid its officer-stockholders in the taxable years ended October 31, in 1942, 1943, and 1944. At a meeting of the directors of the petitioner on April 27, 1941, salaries of $500, per month each were authorized to be paid Tamura and Matsuno, effective from November 1, 1940. These salaries were paid them through April, 1942. On September 12, 1942, the board of directors authorized payment of $10,000 each to Tamura and Matsuno for services rendered as officers prior to their evacuation. Respondent allowed a deduction for salaries to the extent of $3,000 paid each officer from November 1, 1941, through April, 1942, but disallowed deduction of the $10,000 paid each officer pursuant to the action of the directors in September, 1942. Respondent points out that after April, 1942, the corporation was inactive, Tamura, and Matsuno were at the relocation center, were minor officers of the corporation, and performed no services except in so far as they may have given advice to the trustees who attended to the farming and shipping operations. Petitioner contends that the additional amounts were compensation for services

prior to October 31, 1941, services rendered from November 1, 1941, to April 28, 1942, and services rendered thereafter until October 31, 1942. The only unusual services shown to have been performed prior to evacuation were in the last three weeks before evacuation, when Tamura and Matsuno worked late hours for several days each week to familiarize the trustees with petitioner's leases and crops. After evacuation the services were insignificant. All farming operations were conducted by others. Tamura said that he and Matsuno sent letters giving advice and recommendations, but on cross-examination he said he could not remember writing the officers of the company. So far as the evidence shows, the correspondence was primarily with their attorney and any mention of the corporation's business was casual. In negotiating for the sale and leasing of petitioner's crops and equipment Tamura and Matsuno were acting not as officers of petitioner, but as stockholders. Even though the stock was held by trustees, they were beneficial owners, but they were only minor officers, with no authority to sell corporate assets. It should be noted that the profits were large in that year and the distribution of $10,000 to each of the equal owners of the stock as additional compensation may well have been equivalent to the distribution of a dividend. Services performed before that fiscal year were fully paid for in the prior year. The evidence fails to show that respondent erred in disallowing the deduction claimed for additional compensation for the year ended October 31, 1942.

The salaries of $5,000 each paid to Tamura and Matsuno for each of the two succeeding years were disallowed in the full amounts paid. The petitioner's argument is that in those years Tamura and Matsuno were investigating the possibility of relocating the petitioner in another state. It appears from the evidence that, being barred from the coastal area, they were attempting to find suitable locations for themselves and their families. Having disposed of or leased all the assets of petitioner, they were not in a position to resume petitioner's business without new equipment, and this equipment was at least difficult, if not impossible, to procure. In fact, the petitioner never resumed business and is still inactive. Petitioner had income from the rental of its equipment, and the payment of amounts as compensation was a means of distributing a part of it. No dividends were declared in these years. The evidence does not show the performance of services for petitioner which would justify the allowance of such salaries. The respondent did not err in disallowing the deductions claimed for salaries for these years.

Petitioner alleges that respondent erred in determining a life for depreciation purposes of 10 years for new tractors and of 6 years for new trucks and automobiles owned by petitioner. Petitioner

claimed depreciation at the rate of 25 per cent on all its tractors and automotive equipment. Depreciation deductions at this rate taken in prior years by the partnership operating the business had been allowed by the respondent. Petitioner asserts that continual use and excessive wear upon its equipment justified the 25 per cent rate, and that it was the experience of petitioner and its predecessor that this type of equipment, subjected to this type of use, had an average life of only 4 years. In 1940 petitioner acquired 28 tractors and 16 trucks and automobiles which had been owned by the partnership. Some of these were over 4 years old when acquired by petitioner and their cost had been fully recovered by the partnership through depreciation deductions. Of the total, 5 tractors and 5 automobiles or trucks are shown to have been disposed of by petitioner in the fiscal years ended in 1941 and 1942. The remainder of the equipment was apparently still in use at the time the lease was made in September, 1942. Ten of the tractors and 2 trucks were then over 4 years old. Some of these may have been owned by petitioner in April or May, 1947, when the lessee exercised the option to acquire all petitioner's equipment, including tractors, trucks, and automobiles, by paying the price of $35,000. This automotive equipment would then be from 6 to 12 years old. The petitioner did not show how long these tractors, trucks, and automobiles were used by the lessee after September, 1942, nor whether any of them were taken over by the lessee under its option, nor when they were disposed of by the lessee, either before or after the exercise of the option. Without some affirmative evidence of the actual life of the equipment, we can not say that respondent erred in determining a life of 10 years for tractors, when new, and 6 years for automobiles and trucks, when new. While two witnesses testified that they considered a depreciation rate of 25 per cent was proper, their opinions were not based upon actual records of the life of the equipment. Petitioner has not proved that respondent erred.

Petitioner alleges that respondent erred in determining that an amount advanced to petitioner by its stockholders was not includible as equity invested capital in computing its excess profits credit based upon the invested capital method for the fiscal years ended in 1941 and 1942. In its excess profits tax returns petitioner included in average borrowed capital an account payable to its stockholders in the amount of $73,021.58. This sum was paid in by the stockholders and recorded in an open account as owing to them. It was not represented by any formal evidence of indebtedness, such as a note, bond, or mortgage, falling within the statutory definition of "borrowed capital" for excess profits tax purposes. (Sec. 719 (a) (1), I. R. C.) Petitioner argues that this amount was used as working capital, that on petitioner's first excess profits tax return this amount was

stated to be additional working capital furnished by the stockholders, and that it should be included as "paid in surplus" in computing equity invested capital. Although the amount was transferred in 1947 to "paid in surplus," there is no evidence before us indicating that these advances were intended in the taxable years to constitute "paid in surplus," and we must conclude that petitioner has not shown error in respondent's determination. See *Tri-State Realty Co.*, 12 T. C. 192; affd., 180 Fed. (2d) 593, and *Flint Nortown Theatre Co.*, 4 T. C. 536.

Petitioner alleges that respondent erred in determining petitioner's excess profits tax liability, in that in computing the base period net income of the partnership which was petitioner's predecessor and which was engaged in vegetable farming during the base period years, respondent, pursuant to section 35.742–1 (b) (2) of Regulations 112, allowed $12,000 per year as a reasonable deduction for salaries of the partners for services actually rendered. Where a corporation subject to excess profits taxes has acquired the business of a predecessor partnership which had base period experience, it is permitted to compute its excess profits credit by using the base period net income of the predecessor as though the predecessor had been a corporation in the base period years, with certain adjustments necessary to conform the partnership income to income of a corporation. One of the adjustments is an allowance for salaries for the services of partners. Respondent determined that $12,000 per year represented a proper allowance for such salaries, taking the figure adopted by petitioner in fixing the salaries of its stockholder-officers in the first year of petitioner's operation. The burden is on the petitioner to show error in this determination. The partnership had gross receipts averaging over $670,000 per year in the base period and profits averaging over $20,000 per year before payment of salaries. This average exceeds the gross receipts and net profits before salaries of petitioner in its first year of operation when it voted and paid $12,000 as compensation of its officer-stockholders. Petitioner contends that the actual salary paid Tamura of $2,100 for 1936, 1937, and 1939, and $2,250 for 1938 should be the amount used. The test is not what salaries were paid by the partnership, but what would be a reasonable allowance had it been a corporation. Considering the volume of business done, the amount of work shown to have been involved, and the profits realized, we think petitioner has not shown respondent's determination in this respect to have been erroneous.

Petitioner also contends that since the position taken by the respondent, that depreciation on tractors and automotive equipment is allowable on the basis of an estimated life of 10 and 6 years, respectively, is inconsistent with the treatment of depreciation deductions with respect to such items during the base period years, when an estimated life of 4

years was accepted, petitioner is entitled to an adjustment authorized by section 734 of the code.[1] Section 734 authorizes an adjustment if, in determining the excess profits tax of a taxpayer an item affecting the excess profits *credit* is treated in a manner inconsistent with its treatment in determining the income tax liability of the taxpayer or its predecessor in a prior year. The position taken by the respondent is with respect to an item affecting, not the excess profits *credit*, but the excess profits *income*. Respondent is not seeking to recompute the base period income by changing the depreciation rate actually used in the base period years. Respondent is adopting a different rate in determining the income in the excess profits tax years. The petitioner's pleadings do not allege that in determining the excess profits credit depreciation rates of 10 per cent and 16⅔ per cent should be used. If petitioner so contended and that contention were adopted in the determination, the effect of the adjustment would be an increase in the income taxes of petitioner's predecessor and the respondent, not petitioner, would be entitled to invoke section 734. See *Leonard Refineries, Inc.*, 11 T. C. 1000. The question of revising the computation of depreciation in determining the excess profits *credit* has not been raised. Under the circumstances there is no occasion for recomputing the excess profits credit or for the application of section 734.

*Decision will be entered for the respondent.*

---

[1] SEC. 734. ADJUSTMENT IN CASE OF POSITION INCONSISTENT WITH PRIOR INCOME TAX LIABILITY.

\* \* \* \* \* \* \*

(b) CIRCUMSTANCES OF ADJUSTMENT.—

(1) If—

(A) in determining at any time the tax of a taxpayer under this subchapter an item affecting the determination of the excess profits credit is treated in a manner inconsistent with the treatment accorded such item in the determination of the income-tax liability of such taxpayer or a predecessor for a prior taxable year or years, and

(B) the treatment of such item in the prior taxable year or years consistently with the determination under this subchapter would effect an increase or decrease in the amount of the income taxes previously determined for such taxable year or years, and

(C) on the date of such determination of the tax under this subchapter correction of the effect of the inconsistent treatment in any one or more of the prior taxable years is prevented (except for the provisions of section 3801) by the operation of any law or rule of law (other than section 3761, relating to compromises),

then the correction shall be made by an adjustment under this section. If in a subsequent determination of the tax under this subchapter for such taxable year such inconsistent treatment is not adopted, then the correction shall not be made in connection with such subsequent determination.

(2) Such adjustment shall be made only if there is adopted in the determination a position maintained by the Commissioner (in case the net effect of the adjustment would be a decrease in the income taxes previously determined for such year or years) or by the taxpayer with respect to whom the determination is made (in case the net effect of the adjustment would be an increase in the income taxes previously determined for such year or years) which position is inconsistent with the treatment accorded such item in the prior taxable year or years which was not correct under the law applicable to such year.