Fisher Brown v. Commissioner. Winnie F. Brown v. Commissioner.
Brown v. Commissioner
Docket Nos. 23799, 23800.
United States Tax Court
1950 Tax Ct. Memo LEXIS 39; 9 T.C.M. (CCH) 1054; T.C.M. (RIA) 50288; November 20, 1950
S. L. Mayo, Esq., 625 Republic Bank Bldg., Dallas, Tex., for the petitioners. John P. Higgins, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion LEMIRE, Judge: These proceedings, consolidated for hearing and opinion, involve deficiencies in income tax for each of the petitioners for the years 1945 and 1947 in the amounts of $255.93 and $867.14, respectively. The deficiencies arise from respondent's determination that the cost of certain leasehold capital improvements should be depreciated over a greater period than that used by the petitioners; *40 that an obligation which became worthless in 1947 was a nonbusiness bad debt rather than a business bad debt, as claimed by the petitioners; that the consideration received by the petitioners upon a sale of stock in 1947 should not be reduced by an amount repaid to the purchasers in 1948; and that the consideration received by the petitioners upon the sale of a business interest in 1947 included the face value of a note received, in addition to cash. Following brief general findings of fact, specific findings of fact and opinion will be presented for each principal issue. General Findings of Fact The petitioners are husband and wife residing in Dallas, Texas. They filed separate individual income tax returns for 1945 and 1947 with the collector of internal revenue for the second district of Texas. The petitioners keep their books and records and report their marital community income on the accrual basis by calendar years. For approximately fifteen years Fisher Brown, hereinafter referred to individually as the petitioner, has engaged generally in manufacturing and distributing merchandise, consisting primarily of foods, confections, candy, and coin-operated vending machines. *41 He has also promoted, financed, and participated in at least ten businesses with other persons to distribute and operate coinoperated vending machines, pin ball machines, and phonographs, usually participating in several different ventures at once. These businesses usually originated with some other persons who proposed the idea and operated the business. The petitioner advanced the necessary capital in the form of loans to finance them, with an understanding that the first profits of the venture, less living expenses for the active member of the venture, would be applied to repayment of the loans to the petitioner. After the petitioner recouped his capital he became an equal partner in the venture with the active member. Some of these ventures were unprofitable and short-lived but some yielded considerable profits. One of petitioner's ventures, the partnership of Brown & Halfpenny, is typical of his more successful enterprises. Early during World War II Halfpenny came to petitioner with a practical formula for making an egg substitute for baking, called "aigalt." Petitioner promoted and financed the development of the business to produce and sell the product, with the usual arrangement *42 to share profits after petitioner's advances had been repaid to him. The venture prospered and after petitioner's advances were repaid a partnership was formed, which proved successful. As a side line the partnership also operated a bakery, producing fruit pies. In 1945 petitioner, Halfpenny, and a third person contributed new capital equally to a partnership organized under the name Dallas Food Products Company. This partnership acquired the right to produce and sell aigalt from Brown & Halfpenny and also produced and sold a salad dressing. The Brown & Halfpenny partnership then entered into the field of wholesale distribution of household appliances and furniture. The petitioner and Halfpenny bought out the interest of the third partner in Dallas Food Products Company when he became dissatisfied with the business arrangement, and for a brief period operated the business as a partnership. When Halfpenny's son returned from military service and wished to participate in Dallas Food Products Company, petitioner and Halfpenny incorporated the business, each taking one-half of the capital stock. Halfpenny thereafter transferred some of his stock to his son while petitioner held his *43 one-half of the stock and the business was operated as before, in corporate form. Depreciation Issue Findings of Fact: In September 1943 petitioner moved his candy and confection manufacturing business into a building on South Ervay Street in Dallas under a two year lease beginning September 15, 1943, and ending September 14, 1945. The lease in part provided: "The Lessee binds himself to pay as the consideration for said demised premises the sum of FORTY-EIGHT HUNDRED DOLLARS ($4800.00) payable in monthly instalments of TWO HUNDRED DOLLARS ($200.00) per month * * *. * * *
"It is understood and agreed that the Lessors shall proceed without delay to repair and put * * * said building in first class condition without any cost to the Lessee. It is further expressly agreed and understood that any and all other repairs and alterations of every kind and character to be made on said building for the use of the Lessee shall be made by and at the expense of the Lessee * * *. * * *
"* * * upon the expiration of this lease the demised premises will be redelivered to Lessors or their successors and assigns in as good condition as they were at the time of the beginning of this *44 lease, ordinary wear and tear excepted; and it is further agreed that whatever changes and alterations are made in said building shall be removed at the expiration of this lease and the premises returned to the Lessors * * * in the original form in which they are at the time of the execution of this agreement. "The Lessee is hereby given an option to renew and extend this lease at the expiration hereof for a period of two (2) years at an agreed rental of TWO HUNDRED FIFTY DOLLARS ($250.00) per month, provided that said option shall be exercised only by Lessee giving Lessors written notice of his intention to exercise it at least sixty (60) days before the expiration of this lease." To adapt the Ervay Street building for use in his business, petitioner made leasehold improvements at a cost of $3,148.48 in 1943 and 1944. Of this amount $1,222.98 was depreciated through income tax deductions in petitioners' tax returns for 1943 and 1944, leaving an undepreciated balance on January 1, 1945, of $1,925.50. In the summer of 1945 the petitioner considered moving his candy business to another location but was unable to find a suitable building. On or about July 15, 1945, at about the *45 time he was obligated to give notice to his lessor if he intended to exercise the renewal option in his lease, the petitioner entered into negotiations with the lessor for a new lease. As a result of negotiations, a new lease agreement was executed on July 20, 1945, for a two year term to begin September 15, 1945, and to end September 14, 1947. The pertinent provisions of this lease agreement are substantially identical to those in the original lease, except that the rental was increased to $250 a month and no renewal option was included. On or about March 15, 1945, petitioner leased a plant located on South Harwood Street in Dallas, which he designated Plant No. 2, for use in his candy manufacturing business. He immediately made leasehold installations to adapt the building to that purpose, at a cost of $248.31. Before the end of the year the petitioner ceased the manufacture of candy in that plant and the installations made for that purpose were entirely abandoned as unsuitable for any other use. After petitioner discontinued the manufacture of candy in this plant, he maintained offices there for himself, for Brown & Halfpenny, and for Dallas Food Products Company. The petitioner *46 continued to lease the building throughout the taxable years here involved. In the income tax returns filed for petitioners for 1945 the entire amount of $1,925.50 was deducted for depreciation of improvements in the South Ervay Street building in that year, and the amount of $248.31 was deducted for improvements made and abandoned in the South Harwood Street building in that year. Respondent added the two amounts and allowed as a depreciation deduction for 1945 the amount of $790.44, or 12/33 of the aggregate amount, on account of his determination that the unextinguished cost of the leasehold improvements as of January 1, 1945, in the South Ervay Street building, plus the cost of improvements made in 1945, should be depreciated over the remainder of that lease in 1945 plus the additional months that building was leased, or a total of thirty-three months. Opinion: The first and principal issue is whether respondent erred in his determination that the undepreciated cost of $1,925.50 as of January 1, 1945, of leasehold improvements in petitioner's South Ervay Street plant should be depreciated over a thirty-three month period, consisting of the remaining nine months of petitioner's *47 original two year lease in 1945 and of twenty-four additional months for which petitioner leased the property after his original lease expired. The petitioner argues that the entire amount should be taken in 1945 on the ground that the original lease expired then, or, in the alternative, that the amount should be depreciated at the original rate up to July 15, 1945, when there was reasonable certainty a new lease would be executed or the original lease renewed with the then undepreciated balance to be depreciated over the extended term. Regulations 111, section 29.23(a)-10, provides that the method of determining the "reasonable allowance for the exhaustion * * * of property used in the trade or business" permitted by section 23(1), Internal Revenue Code, is to make an annual deduction of "an amount equal to the total cost of such [leasehold] improvements divided by the number of years remaining of the term of lease." In the cases where the lease contains an option to renew the manner of spreading the depreciation or amortization over the term of the original lease, together with the renewal period, depends upon the facts of the particular case. The regulations *48 provide as a general rule that unless the lease has been renewed, or the facts show with reasonable certainty that the lease will be renewed, the undepreciated cost of the improvements should be spread only over the number of years the original lease has to run without taking into account any right of renewal. This issue does not depend upon whether the lease was renewed or extended or whether it was replaced with a new lease, although it is apparent that the terms of the lease agreement of July 20, 1945, were substantially identical to those called for by the renewal option of the original lease and extended the holding period of the premises for twenty-four months, just as an ordinary renewal or extension of the original lease would have done. Depreciation is an annual affair to be calculated at the end of the year in view of the conditions known to exist at that time. Commissioner v. Mutual Fertilizer Co., 159 Fed. (2d) 470; Leonard Refineries, Inc., 11 T.C. 1000; Reg. 111, sec. 29.23(1)-5. Since the petitioner knew with absolute certainty before the end of his taxable year 1945 that the holding period of the premises had been increased for a definite *49 period, the unrecovered cost of the improvements as of January 1, 1945, must be depreciated over the full remaining period of thirty-three months to meet the statutory requirement of reasonableness in view of the particular facts of this case. Leonard Refineries, Inc., supra; Morris Nachman, 12 T.C. 1204. Respondent's determination as to depreciation of the improvements in petitioner's South Ervay Street plant is sustained. The deduction of $248.31 claimed by the petitioners for improvements made and abandoned during 1945 in the petitioner's South Harwood Street plant must be allowed. The evidence is clear that petitioner leased this building and made the installations involved for the purpose of manufacturing candy Before the end of the year petitioner ceased to manufacture candy and the installations were abandoned as unsuitable for any other purpose. That petitioner continued to use the building after 1945 as office space has no bearing on the issue. Bad Debt Issue Findings of Fact: In 1945 petitioner's sonin-law, Jack Martin, was released from active duty as an officer in the Marine Corps at the age of 21. He desired to establish his own business *50 and with petitioner's encouragement became a manufacturer's representative, selling furniture to dealers on a commission basis. However, Martin was unable to secure sufficient deliveries to make appreciable profits. He discussed his business problems with the petitioner who, through Brown & Halfpenny, was Martin's largest customer. It was decided that Martin could obtain larger deliveries of furniture by buying in large quantities for resale as a jobber. Martin became a furniture jobber early in 1946 with financial backing from the petitioner, but was still unable to obtain sufficient deliveries of furniture to satisfy demand. In May 1946 Martin undertook to assemble and finish unfinished furniture in a small plant in Dallas in order to increase his volume to satisfy demand. By the end of 1946, although Martin reported an operating loss for the year, the business had made considerable progress and the future prospects appeared favorable. At the end of 1946 a flood seriously damaged Martin's plant and he then moved the business to another location in Mesquite, Texas, expanding his operation to include all phases of manufacturing tables for household use. Early in 1947 petitioner *51 and Martin reached an understanding that the petitioner would continue to advance funds to the business until it was firmly established, and that after the loans were repaid he would become a partner in the business. At the time, Martin owed the petitioner about $11,000 but the inventories of the business were satisfactory and there were orders on hand for furniture which would take several months of full production to fill. Both Martin and the petitioner treated the advances as loans and expected them to be repaid. Some small payments were made to the petitioner from time to time, but most of the earnings were put back into the business. In early 1947 the petitioner exercised some supervision over the Martin business, advising Martin on the handling of his major business problems, and made efforts to increase Martin's production. Brown & Halfpenny was jobber for Martin's total output at the time. To reimburse himself for some of his advances to Martin's business, petitioner, for several months in 1947, bought Martin's production himself and sold it to Brown & Halfpenny for a higher price. Martin had more demand than he could supply during the summer of 1947, but at that time he *52 encountered serious manufacturing difficulties caused by defective materials, unskilled workmanship, and shipping difficulties. At this time the petitioner assumed all management functions, except actual production management. He kept the business books, approved all purchases, collected accounts, and made some sales. He continued to invest funds and gave a substantial part of his time to the business in an effort to make it profitable and to protect himself. In November 1947 Martin was hopelessly insolvent and was formally adjudged bankrupt in the United States District Court for the Northern District of Texas. Petitioner filed claims for Martin's entire indebtedness to him and the full amounts were approved and allowed. The petitioner recovered about $1,400 in 1948 on the disposition of certain equipment which secured a bank loan on which he had made some payments and was subrogated. He also bought Martin's remaining business assets at the trustee's sale in bankruptcy and sold them at a profit in 1948. However, the petitioner's unsecured claims against Martin in the amount of $42,738.65 became wholly worthless when Martin was adjudicated a bankrupt in 1947, and there were no prospects *53 after that time for any recovery on those claims. In the income tax returns filed for the petitioners in 1947 the entire amount of $42,738.65 was deducted as business bad debts. Respondent did not dispute the amount or the worthlessness of the bad debts, but determined that they were non-business bad debts and were deductible as short-term capital losses rather than business bad debts. Opinion: Since the bad debts incurred by petitioner as a result of his dealings with Martin were not evidenced by securities and neither their amount nor their worthlessness at the end of 1947 are disputed, we have to determine only whether the debts are to be considered business bad debts, deductible in full under section 23(k) (1), Internal Revenue Code, or nonbusiness bad debts, to be treated as short-term capital losses under section 23(k)(4), Internal Revenue Code. Nonbusiness bad debts are defined by section 23(k)(4) as bad debts not evidenced by securities and not incurred in the petitioner's trade or business. The question whether the loss from a debt becoming worthless was incurred in the taxpayer's trade or business is a question of fact to *54 be determined by the relationship it bore to the trade or business of the taxpayer. If that relation was a proximate one in the conduct of the petitioner's business when the debt became worthless, the debt is not a nonbusiness debt for the purpose of section 23(k)(4), Internal Revenue Code. Reg. 111, sec. 29.23(k)-6. Respondent contends that the petitioner was engaged in the food manufacturing business, not in the money lending business, and that there was no relationship between that business and the advances he made to Martin to help him get started in the furniture manufacturing business. However, there is no question that a taxpayer may be engaged in several businesses at once. The petitioner here was primarily engaged in the business of manufacturing foods of various kinds through several business organizations, but he was also engaged in the business of distributing furniture. He had promoted, financed, and participated in numerous and varied business ventures in recent years, sometimes being engaged in several unrelated ventures at once. The petitioner was naturally interested in helping Martin establish himself in business as a furniture manufacturer, *55 but the facts show that the petitioner always dealt with Martin at arm's length and was always mindful of his own business interests. Had the Martin business proved successful the petitioner expected to profit in several ways. It would have been an important source of furniture for the electrical appliance and furniture distribution business of Brown & Halfpenny, and it would have resulted in another partnership similar to the several others in which the petitioner had interests. We conclude that the petitioner made the advances to Martin as loans for purposes connected with his business as a distributor of furniture and with his business as a promoter and participant in the wide range of businesses in which he was interested. Cf. Montell Davis, 11 T.C. 538; Vincent C. Campbell, 11 T.C. 510. See also Washburn v. Commissioner, 51 Fed. (2d) 949; Foss v. Commissioner, 75 Fed. (2d) 326; Maloney v. Spencer, 172 Fed. (2d) 638. We think that the respondent erred in disallowing the bad debt deduction under section 23(k)(1), Internal Revenue Code. Stock Sale Issue Findings of Fact: In 1947 the petitioner *56 and Halfpenny sold all their stock in Dallas Food Products Company for $15,000 in cash and the assumption by the purchasers of certain indebtedness, understood by the parties to be approximately $18,000 as of October 31, 1947, the effective date of the sale. When they found that the business indebtedness would exceed that amount the parties agreed that the petitioner and Halfpenny would assume one-half of the additional indebtedness and the purchasers would assume the other half. Petitioners reported a long-term capital loss on the sale of the stock in 1947, as follows: Sale Stock, Dallas Food
Products 10-31-47
$ 7,500.00
Cost, 11-1-46
17,500.00
NET LOSS
10,000.00
50% applicable thereof
($5,000.00)
After a complete audit had been made of Dallas Food Products Company's accounts in 1948, the parties agreed that petitioner's and Halfpenny's share of the excessive indebtedness was $2,184.66. That amount was paid to the purchasers by check drawn on the Brown & Halfpenny partnership bank account on March 24, 1948. Petitioner's partnership account was then charged for his half of the payment, $1,092.33. This payment was not reported in the returns filed by *57 the petitioners for 1947, but is claimed in the petitions initiating these proceedings as a reduction in the sale price of the stock. Opinion: The petitioners contend that the loss on the sale of the Dallas Food Products Company stock, as reported in their returns for 1947, should be increased by the amount of $1,092.33 paid to the purchasers in 1948. Respondent contends that the loss was correctly reported in petitioner's returns. He argues that although the petitioner knew before the end of 1947 that some reimbursement would have to be made to the purchasers because of errors made in ascertaining the liabilities of the business which were taken into account in fixing the sale price of the stock, the amount of such reimbursement was not known until 1948 and could not have been accrued in petitioners' books in 1947. While the petitioner did not know the exact amount to be repaid in 1947, his liability for the repayment was definite in that year and the basis for computation of the amount was settled. All that remained to be done to conclude the transaction was to make an audit of the company's liabilities to ascertain the exact amount. We think it is apparent from the record that *58 the sale was intended to be, and was, a complete transaction in 1947. The amount by which the actual liabilities exceeded the original estimate used in determining the sale price was ascertainable, if not actually known in 1947. The final determination of the sale price in 1948 related back to and was a part of the 1947 transaction. We think the petitioners are correct in their contention that the adjusted sale price was an accrual of 1947. Henry F. McCreery, 4 B.T.A. 967; Helvering v. Nibley-Mimnaugh Lumber Co., 70 Fed. (2d) 843; Frost Lumber Industries, Inc. v. Commissioner, 128 Fed. (2d) 693. Terrill Note Issue Findings of Fact: During and prior to 1947 the petitioner owned and operated a candy and peanut vending machine business as a sole proprietorship under the name Fisher Brown Company. On October 1, 1947, petitioner sold a one-third interest in the business to James E. Terrill and made him a partner in the business. Terrill paid $22,000 for his one-third interest, $10,000 in cash and a $12,000 note. The note was negotiable on its face and bore interest at the rate of 4 per cent. The one-third interest had a basis for gain or loss *59 in the petitioner's hands of $4,708.63 but was valued at $22,000 because of the record of earnings of the business. Terrill raised the $10,000 cash by selling his home. He expected to be able to pay off the $12,000 note in about two and one-half years, entirely from his anticipated earnings in the Fisher Brown Company business. He owned a small equity in a house, some war bonds, some insurance policies, and an automobile. The petitioner and Terrill orally agreed that the note should be payable only from Terrill's share of the anticipated earnings of the business. No provision was made for payment of the note in the event the business failed to realize profits. The petitioner orally agreed to hold the note only a written evidence of Terrill's indebtedness to him until it was paid, and not to sell or negotiate or make any other commercial use of it. The business failed to earn the amount of profits anticipated and on July 21, 1948, the petitioner and Terrill agreed to dissolve the partnership on September 30, 1948, the end of the partnership's first fiscal year. Since Terrill had paid in only $10,000 of the $22,000 price for a one-third interest in the business, he received a final *60 distribution of 10/22 of one-third of the year's profits for the business in dissolution. The petitioner also repaid to Terrill $5,000 in cash and returned the $12,000 note, on which no payments of principal or interest had ever been made. The remaining $5,000 which Terrill had invested in the business was left in the business as an investment. In their income tax returns for 1947 the petitioners reported the sale of the one-third interest in the business to Terrill as follows: Sale 1/3 interest Fisher Brown Co.
10-1-47
$20,000.00
Cost various
4,708.63
NET GAIN
$5,291.37 Respondent determined that the petitioners realized a gain of $17,291.37, including Terrill's note in the sales price at its full face value of $12,000. Opinion: The petitioners contend that the amount of the Terrill note was incorrectly included in their 1947 income. They argue that the note was nonnegotiable and had no fair market value when received, or at any time thereafter during 1947. That argument would carry considerable weight if the petitioners had kept their books and reported their income on the cash receipts and disbursements basis. In that case a determination of the fair *61 market value of the note in 1947 would be dispositive of the issue since the note would have been includible in the petitioners' gross income only to the extent that it had fair market value and was the equivalent of cash. Section 111(b), Internal Revenue Code. Whether the note was negotiable or nonnegotiable and whether it was conditional or unconditional as to payment are factors to be considered in determining its fair market value. See Dudley T. Humphrey, 32 B.T.A. 280; Edward J. Hudson, 11 T.C. 1042, aff'd., 183 Fed. (2d) 180. But those cases, as well as others cited by petitioners in their briefs, apply only to taxpayers reporting their income on the cash receipts and disbursements basis. The petitioners here reported their income on an accrual basis. Where the accounts are kept and the returns are made on an accrual basis, it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. Spring City Foundry Co. v. Commissioner, 292 U.S. 182. When the right to receive an amount becomes fixed the right accrues if there is a reasonable expectancy that the *62 amount will ultimately be received. See Liebes & Co. v. Commissioner, 90 Fed. (2d) 932. When the petitioners sold the business interest to Terrill and took his note in partial payment, they expected that the business profits would be sufficient for him to pay off the note in about two and one-half years. The petitioner's right to receive payment was fixed at that time. That there was some uncertainty as to when payment would be received is not a material contingency to their right to receive payment. Neither an event of a later year making ultimate payment doubtful nor the rescission of the sale in a later year is relevant to the propriety of accruing an obligation as income in the year in which the right to receive payment was fixed. See Peyton-DuPont Securities Co. v. Commissioner, 66 Fed. (2d) 718; Automobile Insurance Co. of Hartford, Conn. v. Commissioner, 72 Fed. (2d) 265; Ripley Realty Co., 23 B.T.A. 1247, affd., 61 Fed. (2d) 1038 [no op.] We conclude that when the petitioners took Terrill's note in 1947 with the expectancy of ultimate receiving full payment on it, the full amount of the note became accruable *63 as income to them in the year. Respondent's determination to that effect is sustained. Decisions will be entered under Rule 50.