HARRY GLEIS AND ANN GLEIS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HARRY GLEIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 40161, 40162.    Filed August 29, 1955.

*Harry Stickney, Esq.*, for the petitioners.

*R. G. de Quevedo, Esq.*, and *Lyman G. Friedman, Esq.*, for the respondent.

942

944

OPINION.

VAN FOSSAN, *Judge:* At the outset petitioner protests respondent's resort to the increase in net worth and expenditures method of computing income for the years involved. It is petitioner's contention that the books and records maintained for him by Ann were and are sufficient for the purpose of determining income; that had the necessary effort been made, an accurate computation of income could have been made therefrom; and that respondent's failure so to do was arbitrary and capricious. Precisely, petitioner repeatedly insists that his books of account adequately reflect his income for the years in dispute *if all proper entries were properly made therein.* Petitioner, admits, however, that various items pertaining to his capital account were omitted. Petitioner's business is essentially a cash business. Such a business, by its very nature, lends itself easily to the omission, whether or not intentional, of items of income from recordation. Moreover, such books as were maintained have never been completely audited.

Furthermore, there is nothing in section 41 of the Internal Revenue Code of 1939,[1] on which section respondent relies as authority for his action in the premises, which makes mandatory a showing by respondent that books maintained by a taxpayer are wholly inadequate or that he has exhausted all efforts to compute income therefrom before he may properly exercise the broad authority granted him in the stat-

---

[1] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *

ute. As we have heretofore held, the net worth method is not a method of accounting within the scope and meaning of section 41, *supra*. It is not a substitution for any recognized system of keeping books of account. *Morris Lipsitz*, 21 T. C. 917. Rather, if properly applied, the net worth method merely evidences income apparently received. *Estate of W. D. Bartlett*, 22 T. C. 1228. Nor is its use banned simply because a taxpayer maintains a set of books from which an income can be computed. To the contrary, when there is an inconsistency between the taxpayer's increase in net worth and the income as reflected in his books and reported by him on his tax returns, the net worth method, if approved, provides clear and convincing evidence that such books are not trustworthy, and that all income has not been reported. *Morris Lipsitz, supra*.

Accordingly, we must reject petitioner's contention that respondent's use of the net worth method was arbitrary and unjustified, and sustain respondent as to this point.

Petitioner, however, stoutly maintains that even if respondent be justified in resorting to the net worth method he has erred in his application thereof to the instant facts. It is petitioner's position that respondent's failure, in his computation of net worth, to reflect cash on hand at any date and to take into account any nontaxable income is arbitrary and without reasonable foundation in fact.

Petitioner first decries respondent's failure to make allowances for exempt income received for services in the Army and for certain terminal leave bonds allegedly received as mustering-out pay. Respondent does not dispute the fact that petitioner was in the military service during a portion of the period before us nor that certain income resulting from military service is exempt. But, respondent argues, nowhere does the record disclose the amount petitioner received for such service, nor when it was received, and for these reasons he is unable with any degree of certainty to determine such amounts.

The evidence of record bearing upon this question leaves much to be desired. However, it does show that petitioner served in the Army from August 1942 to September 1944, and that upon his discharge he held the grade of sergeant to which grade he was promoted in February 1943. Thus, any pay received by him for such service in 1943 or thereafter is exempt from tax under section 22(b)(13)(B) of the 1939 Code.[2] True, as respondent points out, there is no positive evi-

---

[2] SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\*   \*   \*   \*   \*   \*   \*

(13) ADDITIONAL ALLOWANCE FOR MILITARY AND NAVAL PERSONNEL.—

\*   \*   \*   \*   \*   \*   \*

(B) Compensation received prior to January 1, 1949, during any taxable year, for active service as a member below the grade of commissioned officer (or commissioned warrant officer) in the military or naval forces of the United States during the present war.

dence as to the exact amount so received by petitioner in 1943 and 1944. But doing the best we can with the evidence at hand and taking judicial notice of the Federal statute in force during those years governing the base pay of the members of the armed services we have determined that petitioner received approximately $838 in 1943 and approximately $637 in 1944 as a result of his service in the Army. See Act of June 16, 1942, ch. 13, sec. 9, 56 Stat. 363, 37 U. S. C. sec. 109 (Supp. IV, 1941–45). As set out above, such income is exempt from taxation and proper allowance therefor will be made in the Rule 50 recomputation consequent hereon.

The meager evidence with respect to terminal leave bonds which petitioner is supposed to have received, in the aggregate, presents no basis upon which to make an independent determination. Moreover, it should be noted in passing, petitioner's discharge from the Army, a photostatic copy of which is in evidence, reads on its face that he was "Not Entitled to Mustering-Out Pay." It is our conclusion, therefore, that respondent did not err by his failure to make an allowance for the alleged receipt and subsequent cashing of a terminal leave bond, and we so hold.

Petitioner next attacks as arbitrary respondent's failure to give credit in his net worth computation for cash on hand at any date over and above that deposited in banks. Respondent's position with respect to this item is that the evidence does not justify allowing any greater amount of cash on hand during any of the years involved than has already been allowed.

The evidence with respect to this item shows that in October 1943, petitioner paid $26,000 cash (in currency) for a farm. It is fair to assume that some part of this amount was on hand at the end of 1942. Particularly is this true in view of the facts found by us on this record to the effect that the business carried on by Novelty was essentially a cash business; that it had no bank account prior to 1947; and that until that time its receipts were kept in a safe at petitioner's home.

The logical inference follows from these facts and from other evidence bearing on the point, that petitioner probably did, in fact, have a substantial amount of undeposited cash on hand at the end of each of the years immediately preceding 1947. Accordingly, we have made the best approximation we can on the evidence before us and have determined that petitioner had undeposited cash on hand, for which he should be given credit in respondent's net worth computation, at the end of each of the years 1942 through 1946, in the respective amounts of $16,000, $2,000, $9,000, $5,000, and $7,000. *Cohan* v. *Commissioner*, 39 F. 2d 540.

Petitioner further claims to have received, in or about 1946 or 1947, approximately $25,000 from his father and approximately $47,000

from Ann, both of which amounts were expended on improvements made to the Center. With respect to the latter amount, Ann, so the story goes, supposedly received the greater part of $40,000 in cash from her father on his deathbed in or about 1928 or 1929 for the purpose of caring for her mother. The remaining amount represents bonds owned and cashed by Ann sometime around 1947. As to the alleged gift to petitioner by his father, there is no evidence in support excepting petitioner's bare statement. It was not developed that petitioner's father ever possessed any such sum of money or had an earning capacity that would permit such an accumulation. We have closely scrutinized all the evidence touching upon this point, including that with respect to the ability of the donors to have made such gifts, the length of time since the alleged gifts were made, and, after carefully weighing all the probabilities and the improbabilities, we find ourselves unable to give any credence or weight to such testimony. Respondent, in his computation, has taken into account a net worth for Ann of $27,641.69 at the time of her marriage to petitioner, and the evidence does not justify disturbing such figure.

The next item in respondent's net worth computation that petitioner would dispute is the manner in which the cost of the capital improvements, made to the Center in the aggregate amount of $249,434.53, is treated therein. Originally, on their tax returns, petitioner and Ann claimed an allowance for depreciation of the various improvements involved based upon the respective useful lives thereof. Such allowances were left undisturbed and were so reflected in respondent's computations.

Petitioner now asserts that the cost of the foregoing improvements should properly be amortized over the 10-year term of the lease involved. In this connection, it is petitioner's position that, although he fully intended to purchase the property at the time the lease was executed, as well as when the initial payment on account of the privilege to purchase contained therein was made, he thereafter abandoned such intention and that at the present time there is no reasonable certainty that such privilege will ever be exercised. As evidencing his abandonment of any intention to purchase the property, petitioner points to the fact that he requested and received from the lessor-grantor permission to forego making the second and third payments on account of the option to purchase at the time they respectively fell due and that he has made no further payments on account thereof. Petitioner has also introduced evidence showing that the fair value of the property in dispute is considerably below the amount required to be paid under the privilege to purchase.

After considering the lease agreement here in controversy in the light of the facts surrounding its execution, it is our opinion that the parties thereto fully intended to and did, in fact, effect a sale of the

property involved subject to the performance of certain conditions subsequent, namely, the making of payments in specified amounts on specified dates. *Robert A. Taft*, 27 B. T. A. 808. Cf. also *Truman Bowen*, 12 T. C. 446. We think, further, that the lessor-grantor's waiver of payments to be applied on the purchase price as requested by petitioner did not abridge petitioner's right to exercise the privilege to purchase at any time prior to the lease's termination in 1956. This view is amply supported by the testimony of the lessor-grantor that she felt herself bound to follow through with the sale should the petitioner seek to exercise his option to purchase. That petitioner felt it necessary to seek the waivers in question evidences a continued intention on his part to purchase the property. Further, petitioner has continued to deduct the so-called rent payments, amounting each year to 5 per cent of the unpaid balance due on the purchase price, as interest, and is carrying the initial payment made by him in a property account on the Center's books.

Under the circumstances, therefore, we feel that the option to purchase is still open and will be until 1956, and that no definite action has been taken which abridges that right. This being true, petitioner has it exclusively within his power to extend the use of the improvements in dispute over the remaining useful lives thereof. In such a situation it is proper to depreciate them over the period of such lives rather than to amortize the cost thereof over the period of the lease. See *Leonard Refineries, Inc.*, 11 T. C. 1000, 1010. Accordingly, we so hold.

The next issue involves the proper tax treatment to be accorded certain expenditures made by petitioner and Ann in 1949 in connection with the farm theretofore purchased by petitioner. The items in dispute are the expenditure of $657 for clearing land preparatory to farming it, and the expenditure of $2,708.15 for construction of a lake on the property. Petitioner maintains that these items are to be treated as deductible farm expenses. It is respondent's view that such expenditures are properly to be capitalized. We agree with respondent.

We turn now to the question of fraud. Fraud implies bad faith, a deliberate and calculated intention on the part of the taxpayer at the time the returns in question were filed fraudulently to evade the tax due. *E. S. Iley*, 19 T. C. 631. Such an intention is never presumed. Rather, its presence must be demonstrated by clear and convincing evidence, as to which the burden is with respondent. Involving, as it does, the personal intent of the taxpayer, and intent being a state of mind, seldom may any one specific act be pointed to as evidencing an intent to defraud. The presence, or absence, of such an intent is usually to be determined by a close examination of the taxpayer's whole course of conduct. Thus, whether or not a taxpayer harbors a

fraudulent intention to evade tax at any given time is a fact to be found, as any other fact, from a careful consideration of all evidence on the record, together with any inferences properly to be drawn therefrom. *Charles E. Mitchell,* 32 B. T. A. 1093, affirmed sub nom. *Helvering* v. *Mitchell,* 303 U. S. 391. If a thorough study of the entire record, made with the care a case of this nature requires, and with due consideration for the inferences, leaves the trier of fact with the firm conviction, based upon clear and convincing evidence, that fraud has been perpetrated, only then may the imposition of the so-called fraud penalty, provided in section 293 (b)[3] of the 1939 Code, be sustained.

On consideration of the record before us, with the exception of the year 1947, we find ourselves unconvinced as to the proof of fraud. It is not enough that we entertain a feeling that the taxpayer may have been guilty of fraud in other years or that petitioner was engaged in illegal businesses. We cannot say that the evidence of fraud is clear and convincing.

As to the year 1947, the evidence is much stronger and a different conclusion is clearly indicated. In addition to the other items suggesting fraud, we have the record of the plea of guilty to fraud in the criminal proceedings in the District Court. Petitioner's attempt to explain away his plea of guilty is wholly unconvincing. When coupled with the other evidence, the record is clear and convincing that petitioner was guilty of filing a fraudulent return for 1947. We have accordingly so found as a fact.

The consequence of the above finding is that the statute of limitations bars assessment and collection of the tax for the years preceding 1947, unless, upon recomputation under Rule 50, the amount of tax omitted as to 1946 exceeds the statutory percentage (25 per cent) fixed by section 275 (c), which allows 5 years for assessment and collection of the tax in such an event.

*Decisions will be entered under Rule 50.*

---

[3] SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

(b) FRAUD.—If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, * * *