O. E. Stephens and Grace Stephens v. Commissioner.
Stephens v. Commissioner
Docket No. 48915.
United States Tax Court
T.C. Memo 1956-285; 1956 Tax Ct. Memo LEXIS 4; 15 T.C.M. (CCH) 1474; T.C.M. (RIA) 56285; December 31, 1956
*4 1. Deficiencies in income tax determined by use of net worth method approved subject to adjustments for cash on hand and for minor specific items. 2. Held, some part of the deficiency for each year was due to fraud with intent to evade tax. 3. Addition for substantial underestimation of tax for each year sustained. Marion Hirschburg, Esq., 300 1/2 Main Street, Ames, Ia., Rex B. Gilchrist, Esq., and Don Bowman, Esq., for the petitioners. Marvin E. Hagen, Esq., and Frank C. Conley, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions for fraud and substantial underestimations of tax for the years and in the amounts as follows: Additions
Under-
Year
Deficiency
Fraud
estimation
1949
$16,685.84
$ 8,342.92
$ 839.87
1950
84,823.44
42,411.72
4,424.15
1951
39,153.60
19,576.80
1,683.96
*5 The respondent determined that the amounts of increases in net worth of the petitioners, plus nondeductible expenditures, exceeded the amounts of income reported and that such increases plus expenditures represented taxable income. The petitioners challenge the respondent's determinations on the grounds of being arbitrary and unwarranted, and allege that they kept books of account and other records which clearly reflected income. This case was heard separately from that of O. E. Stephens, Docket No. 48914, but the parties agreed that the evidence adduced in either case may be used in the other. Findings of Fact The petitioners are husband and wife who reside at Littleton, Colorado. They filed joint income tax returns with the collector of internal revenue for the district of Colorado for the years 1949, 1950 and 1951. Grace Stephens is a party to these proceedings only by reason of having joined in the income tax returns. The term "petitioner" as hereinafter used will refer to the husband, O. E. Stephens, who is also known as Ova Elijah Stevens and Charles Belmont Stephens. The principal sources of the petitioner's income in the taxable years were farming, installments on *6 sales of real estate in prior years, gambling activities, and the operation of a hotel and a night club in Arkansas. There is no record of any returns filed by the petitioner for any year prior to 1928. In 1934 the petitioner filed delinquent income tax returns for the years 1928 to 1933, inclusive, and paid additions to the tax on account of delinquency. For each succeeding year through the year 1951, except for the years 1937 and 1939, the petitioner has filed income tax returns and paid income taxes. There is no record of returns filed or income tax paid for the years 1937 and 1939. The petitioner was born in Missouri in 1892 and received a 7th grade education. He resided in Missouri until 1909 when he first went to Denver, Colorado, and worked as a bell hop. He went back to Missouri in 1913 where his principal occupation was gambling. He returned to Denver about 1926 and engaged in the occupations of farming and gambling. In succeeding years, through about 1932, he operated a number of gambling establishments in the vicinity of Colorado Springs. Some of the establishments that he operated were known as the Havana Club, the Benswinger House, the Star Ranch, the Willows Club *7 and the Los Angeles Club. In 1933 the petitioner returned to the Denver area where he opened a dining and gambling club known as Blakeland which he operated until 1936. From about 1934 to 1946 the petitioner bought and sold stocks and commodities through brokers in Denver and in Colorado Springs. He traded in lard, wheat, butter, soybeans, rye and corn. He also traded in stocks of Northern Pacific Railroad, Commonwealth and Southern, Greyhound Bus, South Puerto Rico Sugar, and Gulf Mobile & Ohio Railroad. Operations through trading accounts maintained in the names of the petitioner and his wife resulted in a net profit in the amount of $13,268.20. Those accounts were closed out on July 7, 1943, at which time a check in the amount of $32,183.90 was delivered to the petitioner. After 1943 the petitioner traded in stocks in the name of his partner, Eddie Jordan. He traded on margin and whenever the broker called for additional margin the petitioner furnished it at the time specified by the broker. The petitioner's account was large in relation to the size of accounts of others who dealt with the same broker. His dealings in commodities were in lots of 50,000 to 100,000 bushels. In *8 1946 he sold corn short, and due to a price freeze he sustained a loss in the amount of $22,231.25. In 1941 the petitioner purchased the property hereinafter called the Stockade, which consisted of some 10 acres of land and a building which was used as a gambling house. The purchase price of the Stockade was $13,000, of which the petitioner paid $5,000 in cash at the time of purchase and the balance of $8,000 in cash in 1942. In March 1943 the petitioner purchased a property known as Wild Acre Ranch, or Wildacres, in Arapahoe County for $45,000 which he paid in cash. He sold the ranch in 1946 to J. M. Ferguson along with ranch furnishings, cattle, and other personal property. Ferguson paid petitioner $13,000 in cash, gave checks totaling $22,919.64, and executed a mortgage in favor of the petitioner for $80,000. During the years 1947 to 1951, inclusive, Ferguson made the following payments on the mortgage: Year
Principal
Interest
1947
$30,000.00
$ 83.33
1948
5,000.00
2,500.00
1949
5,000.00
2,250.00
1950
5,000.00
2,000.00
1951
5,000.00
1,750.00
In April 1944, the petitioner and Edward J. Jordan acquired a piece of property known as Wolhurst. *9 The purchase price was $78,000 on which the petitioner and Jordan each paid $14,000 at the time of purchase. The petitioner had on hand cash out of which he paid his share. They executed a deed of trust for the balance of $50,000 of the purchase price. The property had on it a building which had been a residence and which was used by the petitioner and Jordan as a gambling house. The property was also used by them for farming operations and for keeping saddle horses. The petitioner sold his interest in Wolhurst to his co-owner, Jordan, in 1946 for $50,000. Jordan executed a deed of trust to secure the payment of the purchase price and made payments thereon of $25,000 in 1947 and 1948, $10,000 in 1949, and $15,000 in 1950. In January 1947, the petitioner was held up in his home and robbed of $50,500 in cash which he had in his house. The petitioner traced the robber and, with the aid of an attorney and sheriff's deputies, recovered the entire amount. The petitioner paid $1,500 in cash to the sheriff's deputies who had aided him, and a fee in the amount of $3,500 in cash to the attorney whom he had engaged. He turned over $15,000 of the money to his then wife, Nell. On July 5, 1947, the *10 petitioner borrowed from H. H. Looges $10,000 which was received by check. On May 18, 1948, he borrowed an additional $10,000 which was received by check. He also borrowed $3,000 in cash from Looges at some time prior to May 18, 1948. To secure these loans totaling $23,000 the petitioner assigned to Looges the Ferguson deed of trust on Wild Acre Ranch. In November 1947 the petitioner borrowed $10,000 from the First National Bank at Englewood, Colorado, which loan was renewed on March 15, 1948, June 3, 1948, and September 4, 1948, and was paid in full on February 5, 1949. In 1947 the petitioner became interested in the Midway Hotel in Baxter County, Arkansas, and a night club in Marion County, Arkanas, known as the Silver Star Night Club. The properties were within a few miles of a large dam construction project and the indications were that operation of the properties might be profitable. The owner of the properties, Ethridge, was experiencing difficulty in paying off his creditors. The petitioner loaned Ethridge $25,000, represented by a check in the amount of $15,000 and cash in the amount of $10,000. In January 1948, the petitioner paid off additional debts outstanding against *11 the properties, and at that time Ethdridge and his wife deeded the properties to the petitioner. All the creditors were paid off except one Keys who had furnished materials for the hotel and the night club. The petitioner gave him mortgages in the total amount of $33,497.89 to secure his claims. Petitioner paid $5,000 on the mortgages in 1949, $17,500 in 1951, and $7,500 in 1952. The total cost of the Arkansas properties to the petitioner was $71,590.24. Both the hotel and the night club properties were frame buildings. The petitioner contemplated making extensive improvements which included the installation of additional bathrooms and a sprinker system. He also planned to complete a tourist court on which construction had been started on the hotel land. He discussed the cost of proposed improvements with local contractors, who believed they would cost from $100,000 to $200,000 depending upon the extent thereof. He also considered building a home for himself and a race barn. The hotel and the night club were operated by or for the petitioner through the year 1950. The volume of business that the petitioner had anticipated did not develop, and in 1951 he contracted to sell the Arkansas *12 properties to one Mohrbacker for $75,000. Mohrbacker agreed to make a down payment of $20,000, which he did not do. In lieu of a deposit of $3,000 he turned over in 1951 a Tucker automobile to petitioner. In the receipt for the automobile the petitioner acknowledged that it represented $3,000. Later in the same year Mohrbacker turned over to petitioner another Tucker automobile which had cost him about $2,000 at an auction in October 1950. Mohrbacker took possession of the premises and operated for a short while. He then abandoned the property, made no further payments and forfeited the automobiles to the petitioner. At the end of 1951 petitioner had one Tucker automobile. When the profits anticipated in Arkansas failed to materialize, the petitioner returned to Colorado to acquire more land and to expand his operations there. In April 1949, he contracted to purchase 80 acres of bottom land in Douglas and Jefferson Counties, known herein as the Dale property, for $4,250 of which he paid $3,000 at the time of execution of the contract, $1,000 by check and $2,000 in cash. He paid the balance of the purchase price by check on January 23, 1950. In January 1950, he contracted to purchase *13 a tract of about 40 acres in Douglas County, known as Blakeland farm, for a total consideration of $55,000. On January 15, 1950, he paid $7,000 in cash and shortly thereafter an additional $23,000 in cash. The vendor deeded the property to the petitioner, who executed a deed of trust on the property to secure his note for the balance of the purchase price in the amount of $25,000. In March 1951, the petitioner acquired title to property in Douglas County known as the Platte River Ranch (or sometimes as the Bowman Farm). The consideration for the property was $22,500, of which the petitioner paid $1,000 by check in 1950 and the balance of $21,500 in March 1951 by cashier's check. During the period 1947-1951 the petitioner had bank accounts at the United States National Bank, at Denver, the Littleton National Bank, Littleton, Colorado, and the First National Bank of Englewood, Englewood, Colorado. He maintained a safe deposit box at the bank in Denver during the years 1947-1951, and also at the bank in Littleton during the year 1951. The petitioner visited his safe deposit box at the bank in Denver 56 times in 1949, 25 times in 1950, and 18 times in 1951. He visited the safe deposit *14 box at the bank in Littleton seven times in 1951. On the days of visits to his safe deposit boxes as set forth below, the petitioner made deposits of currency to his checking accounts as follows: Amount
of Deposit
U.S. National
Dec. 28, 1949
$ 8,000.00
U.S. National
Feb. 3, 1950
5,000.00
U.S. National
Apr. 17, 1951
60,000.00
U.S. National
Apr. 20, 1951
15,000.00
Littleton
Apr. 27, 1951
7,000.00
Littleton
Apr. 30, 1951
10,000.00
U.S. National
May 15, 1951
50,000.00
During the period 1948 to 1951, inclusive, the petitioner was engaged in various activities including farming, the operation of a gambling club, horse racing and betting at race tracks, and betting upon other events. In 1951 he also financed automobile purchases for one distributor. The petitioner generally put his gambling winnings in his safe deposit box rather than in bank accounts. In connection with his several activities the petitioner kept a number of single entry books in which were recorded various amounts designated as gains realized and income received, and losses sustained and expenses incurred. The books so kept consisted of the following: an account book for *15 the year 1948 in which was set forth items designated as income and expenses pertaining to farming operations, horse racing expenses, monthly gambling club operations and election and racing bets; an account book containing data with reference to the gambling club operations for the year 1949; an account book pertaining to farm operations for the year 1949; an account book pertaining to race track expenses and purses for the year 1949; pay roll books pertaining to gambling club operations one of which related to the period that the club was operated as a partnership in 1949 and the other to the remainder of the year 1949; a pay roll book for the operation of the gambling club for the year 1950; an account book pertaining to the petitioner's farm operations for the year 1950; an account book pertaining to operations of the gambling club in 1950 and also election bets, Centennial Race Track bets, earnings and expenses at Ak-Sar-Ben Race Track, and the purchase of the Blakeland property in the year 1950; an account book containing data concerning the operations of the gambling club for the year 1950 and the months of January and February 1951; a gambling club pay roll book for the months *16 of January and February 1951 which also contained a figure designated as the amount collected during April, May and June, 1951; an account book pertaining to farm operations for 1951, track winnings for 1951 and collections of club accounts after the gambling club was closed in 1951; an account book pertaining to 1951 racing barn expenses and the automobile financing deal in 1951; a summary account book pertaining to the operations of the gambling club for the months of January and February, 1951; a pay roll book pertaining to farm operations for the year 1951; club pay roll book for 1951. One of the petitioner's principal activities in the years 1949 and 1950 and the months of January and February 1951 was the operation of the gambling club known as the Stockade which was situated on one of his properties. Until July 1949 the Stockade was operated by a partnership in which the petitioner had a 60 per cent interest and Edward and Beatrice Jordan each had a 20 per cent interest. Thereafter the club was operated by the petitioner as the sole proprietor. The Stockade building contained a kitchen, dining room and a gaming room. Food and liquor were served in the dining room to patrons *17 of the club without charge therefor. The gaming room contained tables for playing craps, roulette and black jack. It also had two slot machines. The Stockade was not open to the general public and it was not open every night. When it was in operation it was opened at six or seven in the evening and closed the following morning when the patrons left at from one to four o'clock. When the Stockade opened for a night's business a bank roll was supplied by the petitioner and his partner Edward Jordan during the existence of the partnership, and thereafter by the petitioner alone. The amount of the bank roll varied from $8,000 to $10,000, with larger amounts on week ends, and as much as $30,000 on each New Year's Eve. The bank roll was counted by the petitioner's wife, Grace, at the beginning of each night of play at the Stockade, and during the existence of the partnership the amount was verified by a representative of the Jordans and thereafter by the manager of the Stockade, who was employed by the petitioner and whose compensation was 10 per cent of the net profit. The bank roll was placed in the cashier's cage and was used to cash chips presented by patrons when they finished an evening's *18 play. Patrons played mostly on credit. Those who won settled their credit with chips and cashed in any remaining chips at the cashier's cage. Patrons who played on credit and who lost gave checks for the amount of their losses. Amounts that were paid in by patrons who played for cash were placed in a locked box at the table. The petitioner occasionally cashed checks for patrons of the Stockade as an accommodation and for purposes other than the payment of gambling losses. No entries concerning such checks were made in the records of the Stockade. Records of gambling operations at the Stockade were kept by the petitioner's wife Grace. She first made entries in a small notebook in which she noted after the close of each night of operation the letters C.O. and C.B. followed by dollar amounts, which purported to represent, respectively, the amounts of cash paid out at the cashier's cage and the amounts collected in the cash boxes at the gambling tables. The difference between the two amounts was noted in the notebook preceded by the word "Win" or "Loss." Patrons' checks were not noted as winnings until the day they were cashed, which was usually several days after they were received. *19 A permanent bound book was kept which purported to contain the transcribed figures from Grace's notebooks made within a few days after she made the original entry. It also contained items of expenses of operation of the Stockade, entered monthly. Each notebook of original entries kept by Grace covered operations for one month. After the transcription from a notebook for a particular month was completed the notebook was destroyed. Only one such notebook, for the month of January 1951, is in evidence. The permanent account book which covers the year 1950 and the months of January and February 1951 is in evidence. The permanent book for the period in 1948 during which the Stockade was operated and for the year 1949 was lost when the petitioner and his wife moved to the Blakeland farm in 1950. During the existence of the partnership in which the petitioner and the Jordans were partners the representative of the Jordans kept a daily record of the Stockade operations and thereafter a record was kept by the employed manager. They sometimes checked their records with hers and there was never any dispute between them and Grace as to the accuracy of her daily records. In his returns the *20 petitioner did not show separately the amouns received from the Stockade operations. In the 1949 return there is reported total receipts from "Speculations" which includes income from the Stockade, in the amount of $68,047.50. In Schedule C of the 1950 return there is reported total receipts from business or profession in the amount of $142,176.09. The work sheets of the accountant who prepared the return indicate that except for an amount of $4,079.48, this amount was derived from "Speculations." In the 1951 return there is reported income from business or profession the amount of $46,218.35. The accountant's work papers indicate that net winnings from the Stockade for January and February totaled $38,778, and that receipts from "Speculations" for the remainder of the year amounted to $20,330.95. For many years prior to the taxable years the petitioner maintained single entry books in which he entered amounts that were designated as having been won or lost in his gambling operations on each day. Some of such books also contained entries pertaining to receipts and expenses of his business operations. His records were examined by representatives of the respondent in connection with *21 the audit of his income tax returns for the year 1934 and for the years 1943 to 1946, inclusive. Such audits and examinations resulted in the determination of deficiencies for the years 1934, 1943, 1944 and 1946 in the aggregate amount of $3,247.66, and in an overassessment for the year 1945 in the amount of $649.76. The petitioner's returns for the taxable years were prepared by a certified public accountant. The petitioner and his wife submitted to the accountant such of their records as they thought would be needed by him. They furnished him with such additional information in regard to their financial affairs as he requested. They did not furnish him with cancelled checks. From the records and information so furnished to him, the accountant prepared work sheets and from the figures that he assembled on such work sheets, he prepared the income tax returns that were filed. He did not make any independent verification of any item or entries in the books or records furnished to him by the petitioner. In the early part of 1951 the petitioner undertook the financing and storing of Hudson automobiles for Fred Ward, a dealer or distributor of such automobiles. Under the agreement with *22 Ward, the petitioner from time to time purchased, for cash, a number of automobiles, stored them in his barn, and released them from time to time to Ward upon payment by Ward of the purchase price plus $50 for each car released. At least a part of the money used to finance the purchases came from the petitioner's safe deposit boxes. Later in the year 1951, at Ward's suggestion, the automobiles were stored in a garage in Denver. In the year 1951 the petitioner purchased a total of 124 cars in the Ward deal, at a total cost of $278,546.26. He received from Ward total reimbursements for the cost of 101 cars plus $50 each for handling. The total of $5,050 received by the petitioner for handling the 101 cars was reported as income in his income tax return for the year 1951 as gain from auto sales. Ward and the corporation he represented went into bankruptcy in 1951. On investigation into the situation in Denver, the petitioner found that the 23 remaining cars for which he had paid $51,959.62, and which were supposedly in storage, had been taken from storage without the petitioner's knowledge. The petitioner claimed as a deduction in his return for 1951 the amount of $60,339.39 as a loss *23 resulting from the Ward deal. The correct amount of the loss was $51,959.62, the error being due to oversight on the part of the petitioner's accountant who prepared his return. The petitioner kept accurate records regarding the Ward transactions. During the course of the investigation which led to the determination of the deficiencies in issue, the examining agents held eight conferences with the petitioner. On December 4, 1952, he exhibited to the agents the contents of his safe deposit box, which consisted of a diamond ring and $21,000 in $1,000 bills. The petitioner furnished the agents with his books and records, except for the permanent book of operations of the Stockade and club pay roll books. He gave the agents his summary of the Stockade operations and his cancelled checks and bank book stubs. Since 1936, and during the years in question, the petitioner has not received any gifts or inheritances or other nontaxable income. The petitioner was indicted and pleaded guilty under the name of Charles Belmont in 1922 on a burglary charge in the State of Illinois for which he received a sentence of a year, and placed on probation. In March 1937 the petitioner was convicted *24 under the name of Ova Elijah Stevens, alias Charles Stephens, alias Charles Belmont and sentenced by the District Court, Second Judicial District, State of Colorado, to a term of not less than seven or more than 10 years for assault with intent to commit murder and conspiracy to commit murder, and was incarcerated in the state penitentiary at Canon City, Colorado, on March 17, 1939. In December 1952 the petitioner, in a court of the State of Colorado, pleaded guilty to charges of false pretenses and conspiracy to commit false pretenses and was fined $2,000. In January 1955, upon trial before a jury in the United States District Court for the District of Colorado, the petitioner was found not guilty on criminal charges of filing false and fraudulent income tax returns for the years 1949, 1950 and 1951. In the joint returns filed by the petitioner and his wife for the years 1949, 1950 and 1951, after deductions for farm losses in the respective amounts of $37,417.53, $43,962.65 and $29,419.62, there was reported net income of $30,835.15 for 1949, $42,022.70 for 1950, and a net loss of $41,747.48 for 1951. The respondent determined the net income by the net worth plus personal and *25 other nondeductible expenditures method. By the use of that method the respondent determined net income for the years 1949, 1950 and 1951 to be in the respective amounts of $64,118.87, $170,430.12 and $79,811.02. The items and figures used by the respondent, by major categories, in his determination are shown on the following page. ASSETS AND LIABILITIES
Year Ended
12/31/48
12/31/49
12/31/50
12/31/51
Cash on Hand
$ 11,493.18
$ 18,500.00
Cash in Arkansas
1,453.61
$ 677.78
$ 30.09
30.09
Bank Balances
6,193.27
616.06
3,743.93
120.64
Accounts Receivable
1,500.00
1,500.00
Investments
5,000.00
10,250.00
12,000.00
Mortgages Receivable
70,000.00
55,000.00
35,000.00
30,000.00
Personal Effects
1,800.00
1,800.00
1,800.00
1,800.00
Furniture
2,699.24
3,158.40
25,874.94
25,874.94
Automobiles
2,965.92
2,756.92
15,235.45
18,204.35
Race Horses
4,687.50
14,893.75
15,393.75
14,550.00
Farm Livestock
1,547.50
5,620.00
Farm Machinery
8,416.30
11,206.46
15,725.88
20,813.12
Real Estate in Arkansas
63,748.81
63,748.81
63,748.81
63,748.81
Farm and Stockade in Colorado
38,228.36
84,183.40
204,997.57
247,793.60
Notes Payable
(33,000.00)
(15,750.00)
Mortgages Payable
(33,497.89)
(33,497.89)
(53,497.89)
(35,997.89)
Reserve for Depreciation
(5,552.19)
(11,344.56)
(21,084.57)
(34,925.68)
Net Worth
$139,636.11
$182,449.13
$320,265.47
$389,631.98
Increase in Net Worth
$ 42,813.02
$137,816.34
$ 69,366.51
Add: Nondeductible personal and living ex-
penditures
$ 20,489.93
$ 30,543.08
$ 9,437.59
Loss on car traded in
815.92
1,006.92
Political contributions
1,000.00
Missing checks
1,070.00
Net Income
$ 64,118.87
$170,430.12
$ 79,811.02
*26 Findings as to Modifications Required in the Respondent's Net Worth Computation for Purposes of Deficiencies in Tax The total amount of the undeposited cash of the petitioner amounted to $60,000 at January 1, 1949, $40,000 at December 31, 1949 and January 1, 1950, $35,000 at December 31, 1950 and January 1, 1951, and $18,500 at December 31, 1951. At the pertinent dates in the taxable years the several automobiles owned by the petitioner and the costs thereof, which includes allowances on cars traded in, were as follows: Automobile
12/31/48
12/31/49
12/31/50
12/31/51
Ford, 4 door
$2,272.65
Hudson, 4 door
$2,756.92
$ 2,756.92
Chevrolet truck
2,000.00
$ 2,000.00
Ford Station Wagon
2,599.15
2,599.15
Ford pick up
1,379.80
1,379.80
Cadillac, 4 door
6,000.00
6,000.00
Hudson club coupe
3,232.96
Tucker
2,500.00
$2,272.65
$2,756.92
$14,735.87
$17,711.91
The amounts of cash which the petitioner expended for these cars were $594.92 in 1949, $11,978.95 in 1950, and $1,467.68 in 1951. The total cost of the real estate, including improvements and equipment, owned by the petitioner in Arkansas was $71,590.24. *27 Of that total cost, $5,000 represents the cost of land, $14,200 represents the cost of equipment and furniture which had a useful life of eight years, and $52,390.24 represents the cost of buildings which had a useful life of 25 years. Mortgages payable were as determined by the respondent except that the amount at December 31, 1949 and January 1, 1950 was $28,497.89, because of a payment by the petitioner of $5,000 in 1949 on the Keys mortgage. Because of the agreed additional cost of the Arkansas property the amount of depreciation thereon is increased. The depreciation reserves as determined by the respondent, adjusted on account of the increased depreciation on the Arkansas property are as follows: Date
Amount
Dec. 31, 1948
$ 6,710.50
Dec. 31, 1949
12,608.17
Dec. 31, 1950
22,348.18
Dec. 31, 1951
36,189.29
The petitioner had nondeductible and personal living expenses for the several taxable years as follows: Year
Amount
1949
$17,637.12
1950
29,772.54
1951
7,007.53
In 1949 the petitioner, upon the purchase price of a Hudson automobile, traded in a Ford automobile, which had cost him $2,272.65, at a value of $2,150, thereby sustaining *28 a loss on the Ford automobile of $122.65. In 1951 the petitioner sustained a loss of $1,006.92 upon the trade in of a Hudson automobile for another car of the same make. There are no checks missing from the records of the petitioner's bank accounts for the year 1950. A reconstruction of net worth for the taxable years, plus nondeductible expenses, using the figures determined by the respondent which have not been shown to be erroneous, and making the corrections required by the above Findings of Fact, is as shown on the following page: ASSETS AND LIABILITIES
Year Ended
12/31/48
12/31/49
12/31/50
12/31/51
Cash on Hand
$ 60,000.00
$ 40,000.00
$ 35,000.00
$ 18,500.00
Cash in Arkansas
1,453.61
677.78
30.09
30.09
Bank Balances
6,193.27
616.06
3,743.93
120.64
Accounts Receivable
1,500.00
1,500.00
Investments
5,000.00
10,250.00
12,000.00
Mortgages Receivable
70,000.00
55,000.00
35,000.00
30,000.00
Personal Effects
1,800.00
1,800.00
1,800.00
1,800.00
Furniture
2,699.24
3,158.40
25,874.94
25,874.94
Automobiles
2,272.65
2,756.92
14,735.87
17,711.91
Race Horses
4,687.50
14,893.75
15,393.75
14,550.00
Farm Livestock
1,547.50
5,620.00
Farm Machinery
8,416.30
11,206.46
15,725.88
20,813.12
Real Estate in Arkansas
71,590.24
71,590.24
71,590.24
71,590.24
Farm and Stockade in Colorado
38,228.36
84,183.40
204,997.57
247,793.60
Notes Payable
(33,000.00)
(15,750.00)
Mortgages Payable
(33,497.89)
(28,497.89)
(53,497.89)
(35,997.89)
Reserve for Depreciation
(6,710.50)
(12,608.17)
(22,348.18)
(36,189.29)
Net Worth
$194,132.78
$234,026.95
$361,343.70
$395,717.36
Increase in Net Worth
$ 39,894.17
$127,316.75
$ 34,373.66
Add: Nondeductible personal and living ex-
penditures
$ 17,637.12
$ 29,772.54
$ 7,007.53
Loss on car traded in
122.65
1,006.92
Political contributions
1,000.00
Missing checks
Reconstructed Net Income
$ 57,653.94
$158,089.29
$ 42,388.11
*29 Additional Findings as to Items in the Net Worth Computation Bank Balances. The bank balances of the petitioner at the pertinent dates were in the amounts determined by the respondent. Accounts Receivable. The accounts receivable at the pertinent dates were in the amounts determined by the respondent. Investments. The petitioner's investments at the pertinent dates were in the amounts determined by the respondent. These consisted of $5,000 in stock of the Rocky Mountain Kennel Club, $3,750 in a meter device, $1,500 in stock of the Centennial Turf Club, and $6,750 expended in 1951 for stock of the Tri-State Oil & Refining Co. Mortgages Receivable. The mortgages receivable at the pertinent dates were in the amounts determined by the respondent. Personal Effects. The amounts of personal effects at the pertinent dates were as determined by the respondent. Furniture. In 1948 and 1950 the petitioner paid American Furniture Company the respective amounts of $2,296.55 and $65.67 for furniture. Race Horses. In 1947 the petitioner had race horses which had cost him $4,500. In May and June 1949, the petitioner purchased 15 race horses for an aggregate consideration of $12,175. *30 Farm Livestock. In May 1950 the petitioner purchased a number of cows for $897.50. In September 1951 he purchased a Hereford bull for $550. In June and July 1951 the petitioner made two purchases of sheep, for which he paid a total of $1,545. Farm Machinery. In 1948 and 1949 the petitioner paid Colorado Implement Company $2,790.36 and $178.95, respectively, for farm implements. In 1950 the petitioner expended $1,200 for a starting gate in connection with his race horse activities. In 1949 and 1950 the petitioner paid Yeager Equipment Company the respective amounts of $544.17 and $3,365.94 for farm machinery and equipment. In 1950 the petitioner paid "Little Joe" Weisenfeld Company $302.83 for race horse equipment. Farm and Stockade in Colorado. Prior to and during the years in question the petitioner spent large sums for improvements to the properties which comprise the category "Farm and Stockade in Colorado" in the respondent's net worth computation. Amounts were also spent for repairs. He built new buildings and roads, erected fences, and purchased farm machinery. Included in this category in the respondent's net worth computation, in addition to the original cost *31 of the properties, are hundreds of items which he determined to be improvements. The facts regarding these expenditures, to the extent shown by the record, are as set forth immediately following. In 1948 the petitioner paid Stores Equipment Company $1,236.82 for kitchen utensils, dishes, etc. In 1948 the petitioner paid one Cardovo $1,176 for work performed and material furnished in connection with buildings located on the petitioner's ranch. He also built a bridge across an irrigation ditch. The respondent capitalized this amount. At least some portion of this amount was for improvements as distinguished from repairs. The following amounts were paid by the petitioner to the Moore Lumber Company and the Littleton Lumber Company for building materials, and were capitalized by the respondent: 1948
1949
1950
1951
Moore Lumber Co.
$1,232.69
$7,335.13
$14,143.71
$4,301.80
Littleton Lumber Co.
3,123.63
487.31 Most, if not all, of these expenditures were for improvements, as distinguished from repairs. In 1950 the petitioner incurred liability to Western Paving Construction Company in the total amount of $6,874.80 for paving roads on his business *32 properties. Of this amount $4,650 was paid in 1950 and the balance of $2,224.80 was paid in 1951. These amounts constituted capital expenditures. In 1949 and 1950 the petitioner employed one Heckendorf to do various types of work including leveling land, rebuilding a dike, removing sand which had been deposited by floods, building a dam and spillway, and grading in connection with the construction of a race track (the amount paid for this latter item being from $1,200 to $1,500). Most of the amounts paid to Heckendorf were for improvements rather than for repairs. The respondent determined that the petitioner paid Heckendorf $12,262 in 1949, of which the respondent capitalized $9,096, and the remainder of which he treated as a flood loss and omitted from his net worth computation. In 1950 the respondent determined that the petitioner paid Heckendorf $8,200, of which the respondent capitalized $4,827.90. In 1950 the petitioner purchased from Draco Sales Company equipment, including slot machines, at a cost of $4,482.01. In 1949, 1950 and 1951, the petitioner purchased fencing from Elcar Fence Supply Company costing $7,088.53, $4,512.81, and $6,472.99, respectively, of which amounts *33 the respondent capitalized the respective amounts of $6,690, $4,512.81, and $6,400.08. Most, if not all, of the amounts so capitalized constituted capital improvements, as distinguished from repairs. In 1950 and 1951 the petitioner paid Price Plumbing Company the respective amounts of $9,337.90 and $425 for installing plumbing and doing plumbing work on almost every building on the ranch, including the petitioner's home, and these amounts were capitalized by the respondent. At least the greater part of these expenditures were for improvements rather than for repairs. In 1950 the petitioner paid Heard Plumbing and Heating Company the amount of $304.94 for installing a water main at his home. This expenditure was for an improvement rather than for repairs. In 1950 the petitioner purchased equipment from Colorado Natural Gas and Fuel Company at a cost in excess of $738.94. In 1949 the petitioner paid Yeager Equipment Company $141.78 for machinery and equipment. In 1950 the petitioner purchased from Marsch Refrigeration Company a refrigerator at a total cost of $1,394.34, of which $100 was paid in 1950 and $1,294.34 was paid in 1951. In 1950 the petitioner paid John C. Reeves *34 and Company $598.20 for installing asphalt tile and linoleum in his residence. This constituted an improvement rather than a repair. In 1950 the petitioner paid the Farm Implement Company $1,103.85 for installation of certain sprinkler equipment. The Robbins Electric Company did both repair and new work for the petitioner. In 1950, 75 to 85 per cent of the work constituted new installation. Some new work was also done in 1949. The respondent determined that in the years 1948 to 1951, inclusive, the petitioner paid Robbins Electric Company the respective amounts of $710.74, $3,224.74, $2,399.94, and $1,269.07, which he capitalized. During the years in question one Rayner did work for the petitioner consisting principally of new construction, although he did some repair work. The respondent determined that the petitioner paid Rayner in the years 1948 to 1951, the respective amounts of $2,750, $7,944.57, $14,035.83, and $2,811.85, which he capitalized. He also determined that an amount of $415 was paid to Rayner in 1949 for leveling, but did not include such amount in his net worth computation. In 1950 the petitioner paid Schriber Decorating Company a total of $2,738.10 for painting *35 farm buildings, tenant houses, the petitioner's home, and a new club house, of which amount the respondent capitalized $2,726.35. At least some part of this expenditure was of a capital nature. In 1949 the petitioner paid Colorado Central Power Company $745 for an electric extension line. In 1949 the petitioner paid American Furniture Company an amount of $3,748.36 for furniture. In 1950 the petitioner paid Denver Appliance Company $1,042.75 for the installation of kitchen equipment. Notes Payable. The notes payable at the pertinent dates were in the amounts determined by the respondent. Estimations of Tax The amounts of estimated tax shown on the declarations filed for the taxable years were: $10,820.90 for 1949, $24,688 for 1950, and $11,087.54 for 1951. The amount of estimated tax shown on the declarations filed was, in each instance, less than 80 per cent of the correct tax liability. Some part of the deficiencies for each of the years 1949, 1950 and 1951 was due to fraud with intent to evade tax. Opinion The respondent employed the net worth method of determining income in this case on the ground that the books and records kept by the petitioner were inadequate *36 and unreliable and that correct net income could not be determined therefrom. The petitioner, on the other hand, contends that his books and records contain all items of income and that they were adequate for the computation of his taxable income. The books and records are described in the Findings of Fact. We have examined them with great care and have carefully considered the testimony of the petitioner, his wife, and others with regard thereto. The petitioner testified that all items of income were recorded. However, his testimony is not corroborated by the books and other evidence of record and we are unable to accept his self-serving statement and conclude that the books are complete and reliable. See Hoefle v. Commissioner, 114 Fed. (2d) 713, affirming a decision of this Court. The petitioner's principal regular activity and apparently the chief source of his reported income in the years 1949 and 1950, and part of 1951, was the operation of the gambling club at the Stockade. The petitioner's wife, who kept the records of the gambling operations at the Stockade, testified that she made daily records of all transactions and that the representative of the petitioner's *37 partners, and later the manager, also kept records in order that they might be assured of getting their shares of the winnings, that their records were checked against hers, and that there was never any dispute as to her figures. However, her daily records, except for one month, were destroyed currently and there is no proof other than her testimony that the figures transcribed into the permanent books corresponded with her day-to-day records. One of those permanent books is lost, and the accountant who prepared the returns was furnished only summaries prepared by the petitioner. Neither party called either the petitioner's former partners or the manager to testify or to produce any records that they might have made of the Stockade operations. The accountant who prepared the returns did not maintain the books of record. For the purpose of preparing the returns, the petitioner furnished the accountant with books pertaining to farm operations, his summary of operations of the Stockade, and papers containing his summaries of operations of the Arkansas properties. The petitioner did not furnish any data in support of the summaries. The original day-to-day records of Stockade operations *38 that were kept by Grace were not available, since they were destroyed. Nor, as stated, was he furnished the permanent records. Petitioner did not furnish the accountant with his bank statements or his cancelled checks. From the summaries submitted by the petitioner, and from answers given by the petitioner or his wife to questions that the accountant asked, the accountant prepared a set of work papers for each year, without verifying the items. The totals of income and deductions shown on such work papers were transcribed by the accountant on the return forms for each year. The returns so prepared were signed by the petitioner and duly filed. It is well established that the use of the net worth method is not banned simply because a taxpayer maintains a set of books from which an amount of income can be computed. Such method may be used to test the accuracy of the books and, when properly employed, may show that the books are not trustworthy. Holland v. United States, 348 U.S. 121; Morris Lipsitz, 21 T.C. 917, affd. (C.A. 4), 220 Fed. (2d) 871, certiorari denied 350 U.S. 845; Frank Imburgia, 22 T.C. 1002; Harry Gleis, 24 T.C. 941; *39 Abraham Galant, 26 T.C. 354. See also Lias v. Commissioner (C.A. 4) 235 Fed. (2d) 879 (Aug. 3, 1956), affirming 24 T.C. 280. In the Holland case the Supreme Court said: "* * * Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. * * *" In the Lipsitz case we stated: "The net worth method is not a system of accounting; it is not a substitute for either the cash or the accrual basis of accounting or any other recognized method of keeping books. When correctly applied to the facts of a particular situation it is merely evidence of income. And when the increase in net worth is greater than that reported on a taxpayer's returns *40 or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *" The petitioner in this case dealt largely in cash, particularly in his gambling business, and these cash transactions are not susceptible of verification. He did not deposit his gambling winnings in his bank accounts, but kept such winnings in the form of cash, generally in his safe deposit boxes. While the operations at the Stockade appear to have been principal source of petitioner's income, it is to be noted that he carried on other gambling operations, testifying that he gambled on "most anything," including horses, football, baseball and elections. All these gambling activities as well as his other operations were a possible source of unreported taxable income. Under all the circumstances here present, we think that the respondent *41 was justified in employing the net worth method of determining the petitioner's taxable income. The respondent's agents made an exhaustive investigation of the petitioner's expenditures both by cash and by checks drawn on his several bank accounts. They examined bills and invoices rendered to the petitioner by stores and suppliers with whom he dealt. They listed in great detail all expenditures made of which they found evidence, whether made by check or cash. They classified all expenditures in each year under the captions of capital, personal, utilities, labor, farm expenses, racing, and miscellaneous. Eight conferences were held between the agents and the petitioner and his then attorney, at which conferences the agents advised the petitioner of the several categories into which they were classifying his expenditures and the petitioner was given the opportunity to show the agents wherein they erred. As the result of those conferences the agents made a number of changes in the classifications into which they had initially put some of the expenditures. Following the conferences the agents prepared net worth statements for each year. In such net worth statements they included as assets *42 the amounts that they had shown in their tabulation of capital expenditures and which remained so classified after they made the changes that resulted from their conferences with the petitioner. The agents did not include in the net worth statements the amounts shown in their tabulation as expended for deductible items under the Internal Revenue Code such as utilities, labor, farm expenses, and racing expenses. Upon ascertaining the increase in net worth for each year the agents added thereto the total of the amounts that they listed in their tabulation as representing the petitioner's personal and living expenses and which had been discussed at the several conferences with the petitioner. The increases in net worth and the personal and living expenses so computed by the respondent's agents were adopted by the respondent in his determination of the deficiencies. The amounts of increases in net worth plus personal and living expenses as ascertained by the agents and used by the respondent greatly exceed the amounts of net income returned by the petitioner. The comparative figures are: Increase in Net
Worth Plus Per-
Net Income
sonal and Living
Shown on
Expenses
Return
1949
$ 64,118.87
$ 30,835.15
1950
170,430.12
42,022.70
1951
79,811.02
(41,747.48) (Loss)
*43 It is, of course, well settled that the petitioner has the burden of proving error in the respondent's determination of deficiencies in tax. See Snell Isle Inc. v. Commissioner (C.A. 5), 90 Fed. (2d) 481, affirming a decision of this Court; Carmack v. Commissioner, 183 Fed. (2d) 1; Joseph V. Moriarity, 18 T.C. 327, affd. per curiam (C.A.D.C.), 208 Fed. (2d) 43. At the hearing the petitioner was afforded every opportunity to show error in the figures that were used by the respondent in reaching his determination. The listings of his expenditures as compiled by the agents and the agents' classifications of such expenditures were placed in evidence. Many of the bills, invoices and store records which showed expenditures by the petitioner were placed in evidence and were available to the petitioner to show error on the part of the respondent. The petitioner was examined at length by his counsel as to the nature of many of the listed expenditures. Such questioning elicited little or nothing that was helpful to his case. For example, he was examined on purchases from the Littleton Lumber Company and the Moore Lumber Company. Some of the *44 questions and answers were as follows: "Q Do you have any idea or have any estimate of how much of this material went into repairs and how much went into improvements? "A The lumber, I would say more of it went into improvements, more of it than there was repairs. "Q Do you have any idea as to percentage? "A No. "Q You have no information or data available to you which would enable you to determine what was improvements and what was repairs? "A No; I haven't." The petitioner was also examined as to payments made to W. E. Rayner, the amounts of which were capitalized by the respondent as costs of barns and sheds and tenant houses. He testified that Rayner "Built some new buildings and done repair work. He done everything." Further that "Rayner was doing more work on new than he was on repairs." Then the following question was asked and answer given: "Q But as to exact statements or estimates, you are unable to give them at this time? "A I couldn't give them; no." The foregoing examples are typical of the petitioner's testimony as to the several items of expenditures as to which he was questioned, some of which amount to substantial sums, such as the amount paid to *45 one fencing company which was in excess of $7,000 in 1949, over $4,500 in 1950, and over $6,000 in 1951. The vagueness and unsatisfactory nature of the petitioner's testimony was called to the attention of his counsel at the trial. Nevertheless, and despite persistent questioning by his counsel, the petitioner was still unable to be more precise in his answers. As shown by the examples above, his testimony in most instances affords us no basis whatever for disturbing the respondent's classification of expenditures. Although, as we have held, the respondent was warranted in using the net worth method of determining income, the evidence and agreements and concessions by the parties, require that some adjustments be made in some items that make up the net worth statement. These items and others that deserve comment will be considered in the order in which they appear in the net worth statement prepared by the respondent and set out in the Findings of Fact. The fact that the respondent erred in some respects in his computation does not suffice to label his determination arbitrary or destroy the presumption of correctness of his whole determination. See Harry Gleis, supra, *46 and Morris Lipsitz, supra.See also Fada Gobins, 18 T.C. 1159, affd. per curiam (C.A. 9), 217 Fed. (2d) 952. Cash on Hand In his net worth computation the respondent included cash on hand, in addition to bank balances, at the beginning of the year 1949 in the amount of $11,493.18. The record does not show how this figure was computed. He included no cash at the end of 1949, at the beginning or end of 1950, or at the beginning of 1951. He included cash of $18,500 as of December 31, 1951. The figure of $18,500, accepted by the respondent, was the amount which the petitioner, at a conference, told the revenue agents he had at December 31, 1951. He arrived at this figure by calculation, using as a starting point the amount of cash which was found in his safe deposit box, namely, $21,000, when it was opened in the presence of the revenue agents on December 4, 1952. We have accordingly found as a fact that that was the amount of cash on hand at December 31, 1951, and have included that amount in our reconstruction of the petitioner's increase in net worth. We think, however, that the respondent was in error in his determination of cash on hand *47 at the other pertinent dates. The record as a whole indicates that it was customary for the petitioner to have available substantial amounts of cash for his various transactions. We know that in January 1947 he had $50,500 in cash because he was robbed of that amount, but later recovered it. In 1947 he loaned Ethridge $10,000 in cash. In early 1949, he paid off his bank loan of $10,000, paid $5,000 to Keys on the mortgages on the Arkansas properties and paid $2,000 in cash on the purchase price of the Dale property. In January 1950, he paid $7,000 in cash on the Blakeland farm and shortly thereafter paid an additional $23,000 in cash on the purchase price of that farm. He maintained a safe deposit box at the bank in Denver from 1947 to 1951, and visited this safe deposit box 56 times in 1949 and 25 times in 1950, and on dates corresponding to some of those visits he deposited cash in the bank - $8,000 in December 1949, and $5,000 in February 1950. In the operation of the gambling business at the Stockade a bank roll of $8,000 to $10,000 in cash was customarily necessary and on New Year's Eve of each year a cash bank roll of as much as $30,000 was needed, of which petitioner presumably *48 furnished 60 per cent during the time that the business was operated as a partnership in 1948 and part of 1949, and of which the petitioner furnished the full amount thereafter. Occasionally he cashed checks for patrons at the Stockade. During 1948 the petitioner contemplated making extensive improvements to the properties in Arkansas which were estimated to cost from $100,000 to $200,000, and he indicated to his banker and others that he had funds available to finance the improvements. There is also evidence in the record that it was customary for the petitioner to meet many current obligations, such as store bills and payments for labor and material, by cash. It has been established that the petitioner spent large aggregate amounts in 1949 and 1950. The evidence is convincing that the petitioner had on hand cash at the beginning of the taxable years in greater amounts than determined by the respondent. However, when we come to the matter of making factual findings of the amounts of cash on hand, we have little direct help from the petitioner, either from statements made by him at the several conferences with the revenue agents or in his testimony at the trial. Throughout repeated *49 questionings by the respondent's agents he failed to state any amounts with any semblance of reasonable exactitude. At the trial before us he did not attempt to fix the amount of cash that he had on hand at any of the dates under question, and in fact did not even attempt to give an amount in round figures. He did testify, and this is corroborated by the testimony of the revenue agents, that he told such agents during the investigation that as of January 1, 1947, he had cash in an amount between $100,000 and $200,000. On direct and re-direct examination at the trial the petitioner's testimony in this regard was as follows: "Q Now, at the time you were examined by these agents, these various conferences, did they ever ask you whether or not you had any money on hand as of January 1, 1947? "A They did. "Q And did you give them an answer? "A Yes. "Q Will you tell the Court what you told them? "A I believe I told them between a hundred and 2 hundred thousand. I didn't tell them exactly what. I just told them between a hundred and 2 hundred thousand. "Q Did they ask you how much cash you had on hand as of December 31, 1947, or January 1, 1948, sir? "A I believe they did. *50 "Q What did you tell them? "A I told them the same thing. "Q Did you have cash on hand as of those particular times, Mr. Stephens? "A Did I have cash on hand? "Q Yes, sir. "A Yes; I did. * * *
"Q Now, when you were questioned yesterday as to whether or not you recalled how many specific dollars you had in cash on the first day of a great number of years - I think up to and including 1947 - you answered, 'I don't remember,' is that correct? "A Yes; that would have to be. I don't remember. "Q Do you remember specifically how many dollars you had in cash on hand as of January 1, 1947, sir? "A No. "Q Do you have any idea in round dollars of what you had on hand and did you tell the agents about that at the time that they questioned you in these various conferences we have spoken about? "A About how much? "Q Yes, sir. "A I think they asked me one time about how much I had in the safety deposit box or how much I had on hand. "Q All right, then let me put it that way, if it is clear to you that way. How much do you recall in round dollars having in the safety deposit box on or about January 1, 1947, that you told the agents about at these various conferences *51 that have been testified to? "A I told them a hundred to 200 thousand. I didn't tell them what I had exactly. I just told them in the neighborhood. "Q As a matter of fact, you didn't know exactly the day they asked you, is that correct? "A I don't know now. I'm sorry I didn't know the day they asked me." While we are satisfied that the petitioner did keep substantial amounts of cash on hand, we do not believe that at January 1, 1949, he had as much cash as he told the agents he had at January 1, 1947, and January 1, 1948, or as he indicated to his banker and others that he had in 1948 available to make improvements on the Arkansas properties. We note from the evidence that he borrowed a total of $23,000 from Looges in 1947 and 1948 and that in November 1947, he borrowed $10,000 from the Englewood bank, which was not repaid until February 1949. In this state of the record, we have used our best judgment, and have concluded and found that at January 1, 1949, the petitioner had on hand undeposited cash in the amount of $60,000, that at December 31, 1949 and January 1, 1950, he had undeposited cash in the amount of $40,000, and that at December 31, 1950 and January 1, 1951, he *52 had undeposited cash in the amount of $35,000. See Harry Gleis, supra, and Cohan v. Commissioner, 39 Fed. (2d) 540. These are the amounts we have used in our reconstruction of the petitioner's increase in net worth. Cash in Arkansas. No evidence was introduced by either party as to this item. Accordingly, we have accepted the respondent's determination, and in our reconstruction we have used the figures shown in his net worth statement. Bank Balances. The record sustains the bank balances determined by the respondent. Such balances are shown in the respondent's detailed net worth statement as follows: 12/31/48
12/31/49
12/31/50
12/31/51
First Natl. Bank of Englewood
$ 706.37
$ 587.55
$ 587.55
$587.55
Littleton Natl. Bank
10.29
1,277.34
(252.79)
(466.91)
U.S. Natl. Bank
5,476.61
(1,248.83)
3,409.18 At the hearing the petitioner placed in evidence a tabulation of his balance at each of the banks at the close of each of the years, except the year 1950, and those figures coincide with the respondent's figures. The balance at the end of the year 1950 remained in dispute. The respondent, in determining the balance *53 at the close of 1950, deducted from the amount shown in the bank's statement the checks which were outstanding at that date. We think the respondent's determination was proper, and in our reconstruction we have used the figures determined by him. Accounts Receivable. The respondent determined that the petitioner owned an account receivable in the amount of $1,500, which petitioner stated to the revenue agents was owing to him by one, Creeley, at the close of each of the years 1950 and 1951, and we have used that figure. Mortgages Receivable. The amounts determined by the respondent for mortgages receivable are the amounts owed to the petitioner by James M. Ferguson and Edward J. Jordan on their purchases of the Wild Acres and Wolhurst properties. The amounts are established by documentary evidence and are not disputed. Personal Effects. This category consists of three items in the respondent's detailed net worth statement, personal effects in the amount of $500, fur coats, $200, and diamond rings, $1,100, total $1,800. These amounts were ascribed by the petitioner to the several items at one of the conferences with the examining agents. We have used these amounts in our reconstruction. *54 Furniture. In our reconstruction we have used the amounts fixed by the examining agents and determined by the respondent. The petitioner stated to the revenue agents that he had purchased furniture at a cost of $4,000 and that he had taken furniture in payment of gambling debts in the amount of $5,000. On the other hand, the respondent has listed expenditures for furniture in the years 1950 and 1951, upon which he based his determination of the cost of furniture on hand at the end of 1950 and 1951. The petitioner has not shown error in the amounts used by the respondent. Automobiles. There is in evidence a tabulation which sets forth in detail the agreed facts concerning the automobiles owned by the petitioner. The pertinent facts as shown are set out in our Findings. The amounts shown therein differ slightly from the amounts determined in the respondent's net worth statement. In our reconstruction we have used the agreed amounts. In addition, we have included in the petitioner's net worth at December 31, 1951, a Tucker automobile at the figure of $2,500. This is in accord with the respondent's determination and is supported by the evidence. On brief the respondent requests that *55 there be included two Tuckers at a total of $5,000. The evidence does show that two Tuckers were received in 1951, but it also indicates that there was only one on hand at the end of that year. Race Horses. The amounts determined by the respondent as representing the cost of race horses was based on the amount stated by the petitioner at one of the conferences with the respondent's agents concerning the year 1947, and adding thereto the cost of horses acquired in later years. The evidence establishes that in 1949 the petitioner purchased race horses at a cost of $12,175. Since there is no showing that the respondent's figures for race horses are incorrect, we have used such figures in our reconstruction. Farm Livestock. The amounts shown in the respondent's net worth statement as representing the cost of farm livestock include cost of cows, sheep, swine, and poultry. There is evidence of purchases by the petitioner in 1950 for $897.50 and in 1951 for $2,095. Additional amounts were included by the respondent as to which no error has been shown by the petitioner. In our reconstruction we have used the figures determined by the respondent. Farm Machinery. The costs of farm machinery *56 determined by the respondent represents the amount that the petitioner stated to the agents he had invested therein in 1947, plus amounts which the respondent determined the petitioner expended for such machinery in subsequent years. The petitioner has not shown any error in the determination so made and we have adopted the respondent's figures in making our reconstruction. Real Estate in Arkansas. The respondent included this real estate at a cost of $63,748.81. The evidence shows that liens were paid by the petitioner in the amount of $7,841.43, which the respondent concedes is a proper addition to cost. In our reconstruction we have therefore used a figure of $71,590.24. Farm and Stockade in Colorado. The amounts shown in the respondent's net worth statement under the caption "Farm and Stockade in Colorado" are broken down in his detailed statement as follows: 12/31/48
12/31/49
12/31/50
12/31/51
Farm land
$ 7,554.22
$10,579.22
$ 27,826.22
$ 50,417.99
Improvements: Houses, barns, sheds, etc.
30,480.64
63,919.68
158,008.95
175,988.41
Leveling, dikes, paving, etc.
193.50
9,684.50
19,162.40
21,387.20 The cost of the farm lands was *57 determined by the respondent on the basis of conferences between the respondent's agents and the petitioner, plus the checking of county records of conveyances. The costs of improvements, houses, barns, sheds, leveling, dikes, paving etc., were determined by the agents in their detailed analysis of the petitioner's expenditures, and some of them were adjusted as the result of their conferences with the petitioner. The costs so compiled by the agents were adopted by the respondent in his construction of net worth. The petitioner, although questioned at length concerning many of the expenditures that were capitalized by the examining agents, has failed to show wherein the agents' compilation was in error, as has been pointed out hereinabove at some length. Indeed, as shown in our Findings of Fact, a large proportion of the items has been established by the evidence. Accordingly, in our reconstruction we have used the respondent's figures. Notes Payable. The notes payable at the beginning of the taxable period in the amount of $33,000 consist of $10,000 payable at First National Bank and $23,000 payable to Henry Looges. There is no controversy as to the $10,000 payable to the bank. *58 As to the Looges item, the petitioner testified, and he insists on brief, that the transaction with Looges was a sale and not a loan. His testimony is that he sold the mortgage on the Wild Acres property to Looges. That testimony is contrary to other and more convincing evidence in the record. Mrs. Looges, the widow of Henry Looges, was familiar with the transaction and her testimony is that the $23,000 was loaned by Henry Looges to the petitioner. A letter from Looges to the petitioner dated May 18, 1948, also indicates that the transaction was a loan. Moreover, the petitioner did not at any time in his income tax returns treat the Wild Acres note and deed of trust as having been sold. The respondent correctly treated the Looges transaction as a loan and we have accordingly in our reconstruction used the respondent's figures for notes payable. Reserve for Depreciation. The petitioner contends that the respondent erred in computing the reserve for depreciation by insufficient allowances on the Arkansas properties. The respondent has conceded that the payment of liens against the properties in the amount of $7,841.43 increased the cost of the properties to $71,590.24. Since these *59 additional claims appear to have been claims of material men, we think it clear that they properly should be added to the cost of the buildings. Both the petitioner and the respondent have treated $14,200 as the proper amount allocable to furniture and equipment having a useful life of eight years. Petitioner contends that $4,500 should be allocated to the land. In the accountant's work papers, on which preparation of the 1948 return was based, the land was shown at a cost of $5,000. A witness testified that the land had a value of about $4,500. He, however, did not seem particularly well acquainted with the acreage involved, and we feel that the figure of $5,000 which the petitioner originally used in preparing his returns is the proper figure to use as cost of the land. It is our conclusion that the portion of the total cost of $71,590.24 to be allocated to the buildings is $52,390.24 and that the basis of the furniture and equipment should not be disturbed. There appears to be no controversy as to the four per cent rate of depreciation used by the petitioner on the buildings. That rate applied to the cost of $52,390.24 will produce an annual depreciation allowance of $2,095.61 instead *60 of $832 determined and allowed by the respondent, and $1,920.98 for the 11 months that the property was owned in 1948 in place of the amount of $762 that was allowed by the respondent for purposes of establishing the reserve for depreciation at January 1, 1949. The amount of the reserve for depreciation has been increased accordingly in our reconstruction of net worth for each year. The petitioner has not shown error in any other respect in the reserve for depreciation. Additions to Net Worth Personal and Living Expenses. Upon determination of the petitioner's net worth, and the amount of the increase therein for each of the taxable years, the respondent added to such increase the amount computed for each year by his agents as representing nondeductible personal and living expenditures. The agents compiled such amounts in great detail. Their compilations are in evidence and as to each item paid by check they show the amount, the name of the payee, and the bank on which the check was drawn. The relatively few cash payments are shown by amount and the name of the recipient. The petitioner's wife was questioned at length concerning many of the expenditures that were treated by *61 the respondent as personal expenses. She was able to identify a number of items in each year which she described and testified were expenses of operation of the farm or the Stockade. We have accepted her testimony on this point. The items which she so identified aggregate $2,852.91 for 1949, $770.54 for 1950, and $2,430.06 for 1951. At the hearing counsel for the petitioner conceded that the respondent's computation of personal and living expenses was correct except as to items which might be proved erroneous. We have accordingly found as a fact that the petitioner had nondeductible personal and living expenditures in the years 1949, 1950, and 1951 in the respective amounts of $17,637.12, $29,772.54, and $7,007.53, and have used these figures in our reconstruction instead of the larger amounts used by the respondent. Loss on Cars Traded In. In the Findings of Fact we have found the amount of the loss sustained by the petitioner in 1949 and 1951 upon the trade-in of two cars. The cost of the cars so traded was included in opening net worth for those years but eliminated from closing net worth (except to the extent reflected in the value allowed upon the purchase of the new cars), *62 thereby in effect allowing a deduction of the losses on such traded cars. Since the petitioner has not shown that the cars were business assets the losses are not allowable and properly should be added back into income in the correct amounts, however, as set forth in our Findings of Fact. Political Contributions. Neither party has introduced any proof on this item and accordingly we have adopted the respondent's figures in our reconstruction. Missing Checks. Upon request by the examining agents for cancelled checks and bank statements for the years 1949, 1950, and 1951, the petitioner furnished them with all but two checks and the record of four charge-back items on one of his bank accounts. The two checks aggregated $300 in amount and represent charitable contributions. Another check in the amount of $170.70, was alleged to be missing but actually was not. It was issued to George L. Meffley on September 27, 1950, for reimbursement for race track expenses. The four charge-back items which aggregate $600 are charges to the petitioner's account for checks drawn by others that had been cleared through the petitioner's account and were found to be uncollectible. None of these items *63 aggregating $1,070.70 constituted taxable income and accordingly we have eliminated them in our reconstruction. As shown in our Findings of Fact the net worth computation of the respondent, revised to eliminate errors as shown by the evidence, results in the calculation of net income for the years 1949, 1950, and 1951 in the respective amounts of $57,653.94, $158,089.29, and $42,388.11, and those amounts will be used in computing the deficiencies in tax under Rule 50. Fraud Issue The respondent added to the deficiencies determined by him, 50 per cent thereof pursuant to section 293(b) of the Internal Revenue Code of 1939[1] on the ground that some part of each deficiency was due to fraud with intent to evade tax. Section 1112 of the Internal Revenue Code of 1939[2] imposes the burden of proof upon the respondent *64 in respect of the issue of fraud, and it has been held that fraud must be established by clear and convincing evidence. Frank Imburgia, 22 T.C. 1002, and Arlette Coat Co., 14 T.C. 751. It is also well established that fraud is never presumed. A. W. Mellon, 36 B.T.A. 977, 1054. In the instant case the respondent has not clearly shown any specific omissions from income. However, he has introduced voluminous evidence in support of his net worth computation which resulted in the deficiencies in tax. The facts established by this evidence and the record as a whole are set forth in detail in our Findings of Fact. While the respondent has not proved all the items and amounts contained in his computation the evidence substantially supports the net worth computation, except to the extent it has been revised by us in our reconstruction. We have set forth in the Findings of Fact all expenditures made in the years *65 in question which are of a nondeductible character, including payments for acquisition of property, on indebtedness, for improvements, and for personal and living expenses. The total of these proven expenditures for each year is greatly in excess of the amounts of net income reported by the petitioner in his returns. The petitioner's only explanation for his increase in net worth through the years in question is that he had cash prior to the beginning of the period which, when added to the income reported, is sufficient to account for all his purchases and nondeductible expenditures. We have given very careful consideration to the question of the amount of cash which the petitioner had on hand at January 1, 1949, and are convinced that he did not at that time have undeposited cash in an amount greater than $60,000, as discussed hereinabove. While the amount of cash on hand at the beginning of the period may account for some of the excess of nondeductible expenditures over reported net income, it is far from sufficient to explain all of such excess. The petitioner's explanation is clearly inadequate. See Jelaza v. United States, 179 Fed. (2d) 202. To establish fraud by *66 direct proof of intention is seldom possible. M. Rea Gano, 19 B.T.A. 518. In Holland v. United States, supra, in which there was no proof of specific instances of false entries, the Supreme Court stated in part: "A final element necessary for conviction is willfulness. The petitioners contend that willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income.' This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of under-reporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand. Spies v. United States, supra, 317 U.S. at pages 499-500, 63 S. Ct. 368." See also United States v. Calderon, 348 U.S. 160; Rogers v. Commissioner, 111 Fed. (2d) 987; and Arlette Coat Co., supra. In William G. Lias, supra, we stated: "In view of the very large discrepancy between the *67 net income, as reported, and the cost of assets acquired, plus the nondeductible expenses, we think it was not incumbent upon the respondent to show any specific amounts of income omitted from the petitioner's returns. Kite v. Commissioner, 217 Fed. (2d) 585, affirming a Memorandum Opinion of this Court filed August 15, 1953 [12 TCM 953]. This record reveals likely sources of unreported income. By his own admission the petitioner was a gambler, and in the taxable year 1943 claimed a loss of approximately $20,000 from his individual gambling activities." In view of the substantial evidence before us we conclude that the petitioner consistently understated his income in substantial amounts in his returns for the years in question and that the respondent has clearly and convincingly established that some part of the deficiency for each year is due to fraud with intent to evade tax. The fact that the petitioner was acquitted by a jury in the United States District Court for the District of Colorado of a criminal charge of filing false and fraudulent returns for the years 1949, 1950, and 1951 is not decisive of the issue here presented as to whether the petitioner *68 is liable for a 50 per cent addition to the tax for fraud. Helvering v. Mitchell, 303 U.S. 391, and William G. Lias, supra. Accordingly, the imposition of the 50 per cent addition to the tax for fraud is approved. Additions to tax under section 294(d)(2) We have set forth in the Findings of Fact the amounts of estimated tax shown on the declarations for the years 1949, 1950, and 1951. Since 80 per cent of the tax on the income as reconstructed will exceed the amounts of estimated tax the six per cent addition to the tax, as imposed by section 294(d)(2) of the Internal Revenue Code of 1939[3] is applicable. DeWitt M. Sherwood, 20 T.C. 733. This will be computed under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
2. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.↩
3. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 per centum of the tax * * * exceeds the estimated tax, * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax * * * whichever is the lesser.↩